CASEY S. MURDOCK, OSB NO. 144914
Murdock@fdfirm.com
FROHNMAYER, DEATHERAGE, JAMIESON,
MOORE, ARMOSINO, & MCGOVERN, P.C.
2592 East Barnett Road
Medford, OR 97504
Telephone:    (541) 779-2333
Facsimile:    (541) 779-6379
        Of Attorneys for Defendant

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| ADAM GILLIAM, | Case No.: **6:25-cv-00492-MTK** |
| Plaintiff, | **DECLARATION OF CASEY MURDOCK SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| **v.** | |
| DANIEL C. MILLER, | |
| Defendant. | |

I, Casey Murdock, do hereby declare and say:

1. This declaration is based on personal knowledge and is made in support of Defendant's Motion for Summary Judgment.

2. I am the attorney for Defendant Sgt. Daniel Miller in this matter.

3. This motion is made in good faith and not solely for the purpose of delay.

Page 1 - **DECLARATION OF CASEY MURDOCK SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

FROHNMAYER, DEATHERAGE, JAMIESON,
MOORE, ARMOSINO & McGOVERN, P.C.
2592 EAST BARNETT ROAD
MEDFORD, OR 97504
FAX (541) 779-6379
TELEPHONE (541) 779-2333

4.  Attached to Defendant's Motion as Exhibit 1 is a true and accurate copy of the police report from the subject incident, Coburg Police Department Case No. C20230045 dated March 25, 2023.

5.  Attached to Defendant's Motion as Exhibit 2 is a true and accurate copy of excerpts from the deposition transcript of Plaintiff Adam Gilliam.

6.  Attached to Defendant's Motion as Exhibit 3 is a true and accurate copy of excerpts from the deposition transcript of Defendant Daniel Miller.

7.  I conferred with Plaintiff's counsel on January 7, 2026 via telephone and we were unable to resolve the dispute.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

DATED this 12th day of January 2026.

_____
Casey Murdock, OSB No. 144914

Page 2 - **DECLARATION OF CASEY MURDOCK SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

FROHNMAYER, DEATHERAGE, JAMIESON,
MOORE, ARMOSINO & McGOVERN, P.C.
2592 EAST BARNETT ROAD
MEDFORD, OR 97504
FAX (541) 779-6379
TELEPHONE (541) 779-2333

# INCICENT / CUSTODY ☐
## Coburg Police Department

# INCIDENT / CUSTODY

**CASE#:** C20230045

91069 N. Willamette St.
Coburg, Oregon 97408
Office (541) 682-7853
Fax   (541) 485-0655

**Related#:20230163**

**Related Report:**
☒ Incident    ☐ Custody    ☐ Supplemental ☒ Use of Force    ☐ Accident
☐ Assault    ☐ DUII    ☐ Evidence    ☐ Other: _____

## Administrative Information:

| Incident Type& ORS Number: | Occurred Date/Time: | Reported Date/Time: | Investigated Date/Time: |
|---|---|---|---|
| **MENACING** | **03/25/2023 @ 1635** | **03/25/2023 @ 1635** | **03/25/2023 @ 1635** |

| Location: | City: | State: | Sector: |
|---|---|---|---|
| **91120 N. COLEMAN ST** | **COBURG** | **OR** | **2** |

## Involved Person/Business Information:

| Inv Type: | Last Name, First, Middle: | Airs No: | Date of Birth: | Race: | Sex: |
|---|---|---|---|---|---|
| **V/C** | **GAYLES, SIMON CLARK** | **N/A** | **01/31/1983** | **W** | **M** |
| Address: | City: | State: | Zip: | Phone: ☐ RES ☒ CELL | |
| **91120 N. COLEMAN ST** | **COBURG** | **OR** | **97408** | **541-790-3551** | |

| Inv Type: | Last Name, First, Middle: | Airs No: | Date of Birth: | Race: | Sex: |
|---|---|---|---|---|---|
| **W** | **STRAUB, DAVID** | **N/A** | **07/24/1971** | **W** | **M** |
| Address: | City: | State: | Zip: | Phone: ☒ RES ☒ CELL | |
| **91117 N. COLEMAN ST** | **COBURG** | **OR** | **97408** | **541-579-8084** | |

| Inv Type: | Last Name, First, Middle: | Airs No: | Date of Birth: | Race: | Sex: |
|---|---|---|---|---|---|
| **DEP** | **TRIMBOLI, TAYLOR J** | **N/A** | **N/A** | **W** | **M** |
| Address: | City: | State: | Zip: | Phone: ☐ RES ☐ CELL | |
| **125 E. 8TH AVE** | **EUGENE** | **OR** | **97401** | **541-682-3978** | |

## Arrested  Suspect  Missing Person    Juvenile    Information:

| Inv Type: | Last Name, First, Middle: | Airs No: | Date of Birth: | Race: | Sex: |
|---|---|---|---|---|---|
| **S** | **GILLIAM, ADAM FREDRICK** | **N/A** | **08/06/1973** | **B** | **M** |
| Address: | City: | State: | Zip: | Phone: ☐ RES ☒ CELL | |
| **1072 MAIN STREET APT #307** | **SPRINGFIELD** | **OR** | **97477** | **541-514-3840** | |

| Id/ Drivers License #: | State | Height: | Weight: | Hair Color: | Eye Color: | Aka's: |
|---|---|---|---|---|---|---|
| | | **6'03"** | **250** | **BLACK** | **BROWN** | **N/A** |

| Detailed description, direction of travel, SMT, clothing or other info: |
|---|
| **DIALYSIS PORT ON LEFT FOREARM** |

## Vehicle Information:

| ☐ Stolen ☐ Suspect ☐ Victim ☐ Located ☐ Involved ☐ Towed | License Plate #: | Vehicle Identification Number : | Year: | Make: | Model: |
|---|---|---|---|---|---|
| Style: | Color: | Description/Damage/Other Information: | | Value: | |

| RO | Last Name, First, Middle: | | Date of Birth: | Race: | Sex: |
|---|---|---|---|---|---|
| Address: | City: | State: | Zip: | Phone:☐ RES ☐ CELL | |

## Charges:   (PC=Probable Cause    W= Warrant    CLC=Citation in Lieu of Custody    CIT= Citation)

| Type: | Charge: | ORS/ORD #: | Warrant/Cite #: | Court: | ☐Bail ☐Security: |
|---|---|---|---|---|---|
| Type: | Charge: | ORS/ORD #: | Warrant/Cite #: | Court: | ☐Bail ☐Security: |
| Type: | Charge: | ORS/ORD #: | Warrant/Cite #: | Court: | ☐Bail ☐Security: |
| Type: | Charge: | ORS/ORD #: | Warrant/Cite #: | Court: | ☐Bail ☐Security: |
| Type: | Charge: | ORS/ORD #: | Warrant/Cite #: | Court: | ☐Bail ☐Security: |
| Type: | Charge: | ORS/ORD #: | Warrant/Cite #: | Court: | ☐Bail ☐Security: |
| Type: | Charge: | ORS/ORD #: | Warrant/Cite #: | Court: | ☐Bail ☐Security: |

| Officer Name/ Badge: | DPSST#: | Date & Time Prepared: | Approved by: | ID#: |
|---|---|---|---|---|
| *Don Miller /864* | 40862 | 3/25/23 @ 2050 | *M  Lee* | #860 |

Page 1 of 5

Defendant's Ex. 1
PLTF 0002 p. 001

# INCIDENT/ CUSTODY REPORT
Coburg Police Department

**CASE#: C20230045**
Page 2 of 5

## Citizen Contact Information:

☐**MISSING PERSON**☐**RUNAWAY:** I am declaring the above named person as missing or runaway. I am requesting the Coburg Police Department enter this person into the police computer as a missing person or runaway.

☐**I DESIRE PROSECUTION, ARREST OR CLC OF THE PERSON NAMED ABOVE:** I desire the prosecution of the named person. I understand I may be called as a witness to testify against the person arrested. I am willing to sign this complaint form and testify against this person in court to ensure prosecution of the person named.

☐**CITIZEN ARREST:** I have arrested this person and I am delivering him/her into the custody of the Coburg Police Department. I have been advised on the liability of this citizen arrest and the possible ramifications of initiating a false report according to ORS 162.375. I realize I may be called as a witness to testify against the person. I am willing to sign this complaints form to ensure prosecution of the person named above.

☐**CONSENT TO SEARCH:** I am authorizing the Coburg Police Department representative to search my ☐ Residence ☐ Vehicle ☐ Person or ☐ Property as described below. I have been advised of my constitutional right not to have a search made without a search warrant. I also understand that I have a right to refuse this consent search at any time prior to or during this consent search. I also declare that I have a right to and I am authorized to exercise this consent search to the Junction City Police representative. I further state I have been made no promises of any kind by the representative and have not been forced or threatened to do so in any manner. I hereby give this written consent to search:

Describe Searched: _____

_____

☐**STOLEN PROPERTY:** I certify that the described ☐property / ☐vehiclehave been stolen. I am the legal owner and/or responsible party of the property described, and thereby, can legally report it as stolen. I furthermore certify that the described property/ vehicle are not involved in any civil matter. I realize that making a false report could result in criminal charges, fines or imprisonment. I certify this to be a true statement.  I also understand I am responsible for all towing and storage fees that may be incurred as a result.

| Print Name: | Signature: | Date/Time: |
|---|---|---|
| | | |

## Other Information:

☐ Parent/Guardian Notified     Date/Time:     ☐ By Phone ☐ In Person     Other Info:          Follow-up Needed: ☐ Yes ☐ No

Reason for Contact     ☐ Call for Service  ☐ Traffic Stop  ☐ Other:     Probable Cause Exists ☐ Yes ☐ No

Transported to: ☐ Junction City Jail     ☐Detox Center     ☐ Lane County Jail     ☐ Hospital     ☐ Other:     Transported by:

## Property Information:          (SP=Stolen Property   RP= Recovered Property   DP= Damaged Property)

| Type | Qty | Description: | Serial # | Value: |
|---|---|---|---|---|
| EV | 1 | **BODYCAM OF INCIDENT** | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | **TOTAL:** |

## Narrative:

SUMMARY

On 3/25/2023, I responded to a report of an armed subject who was reported to be threatening a subject at 91120 N. Coleman Street.  The subsequent investigation led to a report being taken from Simon Gayles and the detainment of Adam Gilliam.  Probable cause was not able to be produced for the arrest of Gilliam for the reported menacing.

ACTION TAKEN

On 3/25/2023, at approximately 1635 hours, I was dispatched to a report of an armed subject who was reported to be threatening a subject at 91120 N. Coleman Street.  Dispatch advised the complainant was not answering questions and was speaking at a whisper.  After reviewing a mapping program on my phone, I determined Simon Gayles resides at the residence.  I know Simon Gayles from several police contacts.  It has been reported that Simon Gayles has been using illegal narcotics and is often in trouble with suppliers, due to lack of payment.

| Officer Name/ Badge: | Officer Signature: | Date Time Prepared: |
|---|---|---|
| Don Miller/864 | Daniel C. Miller | 3/25/23 @ 2050 |

Defendant's Ex. 1
PLTF 0003p. 002

# INCIDENT/ CUSTODY REPORT

Coburg Police Department

**CASE#: C20230045**

Page 3 of 5

Upon my arrival in the area, I staged several hundred yards to the south of the residence on N. Coleman, near the intersection with E. Lincoln Way. While staged, I could see a maroon in color Ford Explorer parked behind a silver in color Ford F-250 I know to belong to Gayles. At this time, I observed two male subjects speaking in the roadway, one subejct, a large framed black male, had something black in his hand. The other subject was a white male with a light colored baseball cap. The subjects were too far away for me to clearly see what the object was in the black male's hand. The subjects parted ways and the white male went to a neighboring residence, directly to the east of 91120 N. Coleman.

Due to the emergent nature of the call, I pulled my vehicle approximately one half of a block closer, and deployed my long rifle. Pointing it at the black male subject with the black object in his hand. I announced my presence and advised dispatch of the situation. Responding cover units were already en route. I had the male subject face away from me and go down to his knees while placing his hands over his head.

Upon the arrival of the first cover unit, Lane County Deputy Trimboli, he advanced to the passenger side of my patrol vehicle and drew his handgun. We continued to hold the subject at gunpoint until the arrival of a third officer. Deputy Trimboli spotted a black object on the ground, just to the east of where the subject was kneeling. This object was what I had seen upon my arrival in the subject's hand. I still could not see if it was or was not a weapon. Upon the arrival of the third officer, Deputy Trimboli and I walked forward while utilizing the patrol vehicle for cover. Once we were approximately 50 feet from the subject. I had him stand to his feet and walk backward to the sound of my voice. When he was approximately 25 feet away from us. I had the subject lift his shirt from the back of his shoulders, exposing his waist line to ensure there were no visible weapons. I called the subject backwards further still until he was approximately 10 feet in front of the cover officers. At this time, I gave directions for the subject to go back down to his knees. Cover officers moved up and detained the subject. A cursory search of the subject yeilded no weapons or means of escape.

Dispatch advised us that they still had the complainant on land line. I asked them to verify if the complainant was Simon Gayles. Dispatch confirmed that it was. I asked them to relay to Gayles to come out into N. Coleman Street with his hands raised. A short time later, a male subject whom I know to be Simon Gayles appeared in N. Coleman Street near the intersection with E. Mill Street. I gave commands to Gayles to walk towards us with his hands raised, as Deputy Trimboli and I advanced towards Gayles as well. As we passed the black object laying on the ground, I could see it was a black in color wallet. Gayles complied and he was detained. A cursory search was conducted for weapon and means of escape. No weapons or means of escape were found. Gayles began to tell us the suspect had arrived at the location due to Gayles owing the suspect's girlfriend money for a job he had not completed. Upon the suspect's arrival, Gayles told me he threatened his life and made affirtive movements, making Gayles think he had a gun.

I asked dispatch to notify my supervisor, Sgt. Lee, due to the high volume of law enforcement in the area so he would be aware of any questions the citizenry may have.

At this time, deputies and troopers responded to our location for cover and cleared the interior of 91120 N. Coleman. Sgt. Lee also arrived on scene.

Sgt. Lee and I escorted Simon Gayles back to my patrol vehicle to obtain his statement. After obtaining Gayles' contact and pertinent information, I asked for his statement. Gayles told me he had met the suspect's girlfriend, "Annie" quite some time ago through his ex-girlfriend. She approached Gayles about doing a flooring job and paid him $2,000 dollars up front. Gayles told me he collected the money and had never returned her phone calls, messages and/or any other attempts she had made to contact him. I asked Gayles why he didn't complete the job. Gayles told me he was unable to complete the job due to his schedule. Gayles went on to say that Annie's boyfriend, the black male suspect whom I had detained, had began to send him messages on facebook, which he had not returned.

Today, at approximately 1630 hours, Gayles was getting into his truck to leave when Annie's boyfriend, Adam Gilliam, pulled in behind his vehicle and confronted him. Gayles told me Gilliam said, "where's my girl's money." "Give me one reason I should let you live right now," said Gilliam. Gayles told me Gilliam was making affirtive movements towards his pockets while coming closer and closer to Gayles. Gayles told me he saw a "flash" in Gilliam's pockets which made him believe Gilliam was concealing a handgun in his pockets.

At this time, Gayles told me he ran inside the residence and locked himself in his step-mother's room and called 9-1-1 to report the incident. Gayles told me he was speaking softly so Gilliam didn't know where he was, as he was afraid for his life. While on the phone with 9-1-1, Gayles told me he could hear Gilliam speaking with his step-mother outside. Gayles

| Officer Name/ Badge: | Officer Signature: | Date Time Prepared: |
|---|---|---|
| Dan Miller /864 | Daniel C. Miller | 3/25/23 @ 2050 |

Defendant's Ex. 1

# INCIDENT/ CUSTODY REPORT
**Coburg Police Department**

**CASE#: C20230045**
Page 4 of 5

told me he left out of the front door and ran northbound on N. Coleman Street and then westbound on E. Mill, eventually hiding in a backyard until he was prompted by dispatch to show himself per my request. Gayles told me as he ran, Gilliam gave chase, loosing sight of him near the intersection of E. Mill and N. Coleman.

At this time, I went back to my patrol vehicle to speak with the suspect, Gilliam. Sgt. Lee stayed with Gayles.

I introduced myself to Gilliam and I had him step out of the Lane County Sheriff's patrol vehicle, which he had been seated in. Gilliam complained about his shoulders hurting. I added a second pair of handcuff's to Gilliam's wrists to alleviate the tension on his shoulders. At this time I obtained Gilliam's contact and pertinent information and asked him for his statement. Gilliam told me he had known Gayles for a long time knew he was needing money. Gilliam told me he offered Gayles a flooring job at his girlfriend, "Annie's" business called, "Collective Beauty Bar." Gilliam told me he paid Gayles $2,000 dollars up front and he had not heard anything from him since that day. Gilliam told me today, he came to Gayles residence to collect some money or something to hold as collateral.

At this time, I advised Gilliam of his Miranda Rights and I asked him if he understood. Gilliam told me he did. Gilliam told me he was upset with Gayles due to the lack of payment. I asked Gilliam if he had ever threatened Gayles and he told me he did not. I asked Gilliam if he had either displayed or threatened Gayles with a firearm and he told me he did not.

At this time, Gayles began screaming at me from the front of my patrol car that there was a tow truck at his residence repossesing his vehicle and asked to go address the issue. I had no authority to keep him away, as he was not a suspect in the incident. Gayles began screaming and ran up the road to his vehicle, leaving a "slide" sandal in the roadway.

I had Gilliam sit back in the patrol vehicle. I went back to the scene to attempt to interview witnesses. Upon my arriving back at the scene, I spoke to David Straub, resident of 91117 N. Coleman St. While speaking with Straub, a female subject began to come extremely close to us while I was conducting my interview. I could see she was filming with her cell phone. Sgt. Lee asked her to step back, but told her she could continue to film. The subject began to berate Sgt. Lee with constitutional rights and her beliefs.

Straub told me he was outside and heard Gayles and Gilliam in an argument. Straub told me he watched Gayles run from the scene northbound on N. Coleman Rd. I asked if he had heard Gilliam make any threats to Gayles and he told me he did not. I asked Straub if he had seen Gilliam chase Gayles and he told me Gilliam walked after Gayles quickly while Gayles ran away screaming, but Gilliam did not chase him. Straub told me, in fact, Gilliam spoke with him in the middle of the street regarding the lack of payment Gayles and Gilliam had told me about. Straub told me Gilliam appeared to be calm, while Gayles was acting extremely erratic. Straub went on to say that he asked Nancy Gayles, Simon Gayles' step mother, if everything was ok and she told him it was. I asked Straub if he had seen or heard mention of a gun and he told me he did not. I obtained Straub's contact information and thanked him for his statement.

Next, I attempted to contact Nancy Gayles without success. I then spoke to the female subject who was filming us and provided her with my business card and struck up a conversation with her to calm her down.

I advised Sgt. Lee of my findings and we determined that we no longer had probable cause for the arrest of Gilliam. We returned to the patrol car where Gilliam was sitting and I released him from handcuffs. I told him he was no longer detained and provided him with his sweatshirt, vehicle keys and cell phones which had been collected during the cursory search. I escorted Gilliam to his vehicle where he left without incident.

I provided Gayles with his wallet that Gilliam had been holding. Sgt. Lee and I stayed on scene while Gayles removed personal effects from his vehicle that was be repossessed. After Gayles' personal effects had been removed, Sgt. Lee and I cleared the scene.


STATEMENTS

See body of the report


EVIDENCE

Bodycam of Incident

| Officer Name/ Badge: | Officer Signature: | Date Time Prepared: |
|---|---|---|
| Don Miller /864 | Daniel C. Miller | 3/25/23 @ 2050 |

Defendant's Ex. 1
PLTF 0005p. 004

# INCIDENT/ CUSTODY REPORT
Coburg Police Department

**CASE#: C20230045**
Page 5 of 5

ACTION RECOMMENDED

**Forward to City Prosecutor for review of possible Initiating a False Report.**
**Attach Deputy Trimboli's report when received**

| Officer Name/ Badge: | Officer Signature: | Date Time Prepared: |
|---|---|---|
| Don Miller /864 | Daniel C. Miller | 3/25/23 @ 2050 |

Defendant's Ex. 1
PLTF 0006 p. 005

Adam Gilliam

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


ADAM GILLIAM,                    ) No. 6:25-cv-00492-MTK

            Plaintiff,      )

    v.                           )

DANIEL C. MILLER,                )

            Defendant.      )


DEPOSITION OF ADAM GILLIAM

October 23, 2025

Thursday

9:30 A.M.


        THE VIDEO-RECORDED DEPOSITION OF ADAM

GILLIAM was taken at CC Court Reporting &

Videoconferencing, 440 East Broadway, Suite 160,

Eugene, Oregon, before Sara Fahey Wilson, CSR/CCR,

Certified Shorthand Reporter in and for the State of

Oregon and Washington.

Defendant's Ex. 2
p. 001

```
 1                        APPEARANCES

 2

 3      For the Plaintiff:

 4           Ms. Marianne Dugan

 5           CIVIL LIBERTIES DEFENSE CENTER

 6           1711 Willamette Street, Suite 301, #359

 7           Eugene, Oregon 97401

 8           541-687-9180

 9           mdugan@cldc.org

10

11      For the Defendant:

12           Mr. Casey Murdock

13           FROHNMAYER DEATHERAGE

14           2592 East Barnett Road

15           Medford, Oregon 97504-8345

16           541-779-2333

17           murdock@fdfirm.com

18

19      Video-Recorded By:

20           Mark Stafford - Stafford Video

21

22      Also Present:

23           Daniel Miller

24           Ross Davies

25
```

Defendant's Ex. 2
p. 002

```
 1                              INDEX

 2

 3     WITNESS.......................................PAGE

 4     ADAM GILLIAM

 5          BY MR. MURDOCK                              4

 6

 7     EXHIBITS......................................PAGE

 8     Exhibit 1         Text Messages               64

 9     Exhibit 2         Text Messages               64

10     Exhibit 3         Text Messages               64

11     Exhibit 4         Coburg Police Department Use  75

12                       of Force Report

13

14     MARKED TEXT..............................PAGE/LINE

15     None.

16

17

18

19

20

21

22

23

24

25
```

Defendant's Ex. 2
p. 003

Adam Gilliam

4

```
1              THE VIDEOGRAPHER:  We're going on the
2     record.  Today is Thursday, October the 23rd, 2025.
3     The time on the camera indicates 9:32.
4                   This is the deposition of Adam Gilliam
5     in the matter of Gilliam versus Miller.  The case
6     number is 6:25-cv-00492.
7                   And at this time I would ask to have
8     counsel identify themselves and whom they represent,
9     and then we'll have our court reporter swear in the
10    witness, please.
11                  MS. DUGAN:  Marianne Dugan for the
12    plaintiff.
13                  MR. MURDOCK:  Casey Murdock for the
14    defendant.
15
16                  ADAM GILLIAM,
17     having been first duly sworn to testify the truth,
18       the whole truth, and nothing but the truth, was
19              examined and testified as follows:
20
21                  EXAMINATION
22    BY MR. MURDOCK:
23       Q.   Good morning.
24            Can you please state your full name for
25    the record.
```

1    mean, not email -- I tried texting him.  I tried

2    calling him.  I tried Facebook messaging it.  Again,

3    I went through his girlfriend -- his ex-girlfriend,

4    Ashland, to try to get ahold of him.  And it was

5    actually her who told me where I can locate him.

6    She was actually the person who told me where I

7    could locate him.

8            Q.      Yeah.

9                    And when you were going to Coburg what was

10   your plan?

11           A.      To ask him about the money that -- the

12   money owed and why he didn't do the job and when he

13   was going to pay it back.  Because the floor had

14   already been done.

15           Q.      And had he responded to you at any time

16   explaining why he had taken so long?

17           A.      He told me he had got high, that he used

18   the money to get high.  He was partying.  Those were

19   his words.

20           Q.      How long before this incident did he tell

21   you that?

22           A.      Excuse me?

23           Q.      How long before this incident did he tell

24   you that?

25           A.      He told me that the day I went to see him.

Defendant's Ex. 2
p. 005

1    when he came and put another pair of cuffs on me.

2        Q.    Okay.

3              You were having some discomfort.  Right?

4        A.    Right.  I had just had dialysis that day

5    and the cuffs -- I have, you know, a broader back,

6    and the cuffs was -- the way they had it, it was

7    putting a strain on my shoulder.

8        Q.    And so the second set of cuffs kind of

9    loosened it up a little bit for you?

10       A.    Yes.

11       Q.    Okay.

12       A.    And then that procedure, they patted me

13   down -- Sergeant Miller patted me down himself that

14   time and, again, no weapons were found.

15       Q.    Okay.

16             Did you ever listen to the audio from the

17   911 call?

18       A.    No, sir.

19       Q.    While you were on scene were you ever

20   advised of why they came guns drawn?

21       A.    Yes, sir.

22       Q.    What were you told?

23       A.    Because they had a phone call of a Black

24   male with a gun at the residence.

25       Q.    Was there a pretty big response from law

Defendant's Ex. 2

p. 006

Adam Gilliam

60

1        Q.    When you were detained and put in cuffs
2    was there any issue from your perspective about use
3    of force?
4        A.    About abuse of force?
5        Q.    Use of force.
6        A.    Use of force?
7        Q.    Were they too rough with you?
8        A.    No, they weren't rough with me.  The
9    sheriff was actually pretty gentle.
10        Q.    Were they ever rude to you?
11        A.    No.
12        Q.    Aside from just being detained for longer
13    than you thought was reasonable, any negative
14    interaction with the officers verbally or
15    physically?
16        A.    Didn't really have any interactions with
17    them outside of being cuffed up and being put in the
18    back of the car.
19        Q.    After you were released what did you do
20    after that?
21        A.    I went to my mentor's house and I had a
22    mental breakdown, pretty much.  And I explained to
23    him what had transpired and cried, and he informed
24    me that I should get an attorney because what
25    happened was illegal.

Defendant's Ex. 2
p. 007

Adam Gilliam

111

```
 1              THE VIDEOGRAPHER:  We're back on the

 2   record.  Our time is 12:05.

 3   BY MR. MURDOCK:

 4        Q.    You good to continue?

 5        A.    I'll be all right.

 6        Q.    All right.  Not much more here.

 7              Okay.  So we're going to detour from that

 8   topic -- and just for the record, we're going to

 9   keep this open because it sounds like you guys kind

10   of thought that you'd pursue this portion of the

11   claim fairly recently.  We'll get some of those

12   medical records and then we can continue, possibly

13   via Zoom, at a later time to get this wrapped up.

14        A.    Okay.

15        Q.    So I wanted to clarify a few points with

16   you.  You understood you were a suspect of a crime

17   while you were detained.  Right?

18        A.    Yes.

19        Q.    Okay.

20              And you were upset.  Is that right?  You

21   told the police that you were upset?

22        A.    Excuse me?

23        Q.    You told the police that you were upset at

24   Simon Gayles?

25        A.    Yes.
```

Defendant's Ex. 2
p. 008

Adam Gilliam

117

```
 1        Q.    Okay.

 2              Then he tries to talk to the mom to get

 3   her version of events as well, and she doesn't

 4   respond.  Is that fair to try to talk to the mom?

 5        A.    Okay.

 6        Q.    Okay.

 7              So that is an investigation to try to tip

 8   the scales towards whether or not there's probable

 9   cause.  And ultimately at the end of the day you

10   were right:  The witness said you were completely

11   fine.  Right?

12        A.    Right.

13        Q.    So no probable cause.  No arrest.

14        A.    Okay.

15        Q.    Okay.

16              Do you understand now, looking at that

17   picture from that perspective, why Sergeant Miller

18   proceeded in the manner he did?

19        A.    No.  Because even after that it took -- it

20   took a substantial amount of time for them to

21   release me from the handcuffs.

22        Q.    How much time?  Do you know?

23        A.    After he talked to the neighbor, I want to

24   say at least another three, four, five minutes,

25   somewhere around there, because he was talking to
```

Defendant's Ex. 2
p. 009

Adam Gilliam

118

1  someone else.

2       Q.    Okay.

3       A.    So, again, that should -- and I'm not

4   saying, oh, snap of the fingers, but no, it should

5   not have taken that amount of time.

6       Q.    Okay.

7             That three to five minutes?

8       A.    I mean, if we're saying an investigation

9   is done, we talked to the neighbor and the neighbor

10  sided with what I said, then, yes, come and release

11  me immediately.  You know, so why am I being

12  detained in this itty-bitty space in the back of a

13  sheriff's car, my hands behind my back, with no

14  freedom of movement?

15      Q.    All right.

16            During that three to five minutes after

17  they talked to the neighbor, was that when they were

18  talking to the lady with the phone?

19      A.    Yes, I believe so.

20      Q.    Okay.

21            And during that conversation did you hear

22  anything that she was saying to them?

23      A.    No, I didn't.  I was inside with the

24  windows up.

25      Q.    Okay.

Defendant's Ex. 2
p. 010

```
 1    State of Oregon      )
                           )      ss.
 2    County of Lane       )

 3

 4        I, Sara Fahey Wilson, CSR, a Certified Shorthand

 5    Reporter for the State of Oregon, certify that the

 6    witness was sworn and the transcript is a true

 7    record of the testimony given by the witness; that

 8    at said time and place I reported all testimony and

 9    other oral proceedings had in the foregoing matter;

10    that the foregoing transcript consisting of 121

11    pages contains a full, true and correct transcript

12    of said proceedings reported by me to the best of my

13    ability on said date.

14        If any of the parties or the witness requested

15    review of the transcript at the time of the

16    proceedings, such correction pages are attached.

17        IN WITNESS WHEREOF, I have set my hand this 6th

18    day of November 2025, in the City of Eugene, County

19    of Lane, State of Oregon.

20

21

22    _____

23    Sara Fahey Wilson, CSR

24    CSR No. 06-0400

25    Expiration Date:  March 31st, 2026
```

Defendant's Ex. 2
p. 011

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


ADAM GILLIAM,                    ) No. 6:25-cv-00492-MTK

              Plaintiff,     )

   v.                            )

DANIEL C. MILLER,                )

             Defendant.     )


DEPOSITION OF DANIEL MILLER

October 23, 2025

Thursday

1:07 PM


     THE VIDEO-RECORDED DEPOSITION OF DANIEL MILLER was taken at CC Court Reporting & Videoconferencing, 440 East Broadway, Suite 160, Eugene, Oregon, before Sara Fahey Wilson, CSR/CCR, Certified Shorthand Reporter in and for the State of Oregon and Washington.

Defendant's Ex. 3
p. 001

```
1                        APPEARANCES

2

3    For the Plaintiff:

4         Ms. Marianne Dugan

5         CIVIL LIBERTIES DEFENSE CENTER

6         1711 Willamette Street, Suite 301, #359

7         Eugene, Oregon 97401

8         541-687-9180

9         mdugan@cldc.org

10

11   For the Defendant:

12        Mr. Casey Murdock

13        FROHNMAYER DEATHERAGE

14        2592 East Barnett Road

15        Medford, Oregon 97504-8345

16        541-779-2333

17        murdock@fdfirm.com

18

19   Video-Recorded By:

20        Mark Stafford - Stafford Video

21

22   Also Present:

23        Adam Gilliam

24        Ross Davies

25        Noah Perez (Via Zoom)
```

Defendant's Ex. 3
p. 002

Daniel Miller

3

```
 1                         INDEX

 2

 3   WITNESS.....................................PAGE

 4   DANIEL MILLER

 5        BY MS. DUGAN                             4

 6

 7   EXHIBITS................................REFERRED

 8   Exhibit 4        Coburg Police Department Use    26

 9                    of Force Report

10

11   EXHIBITS.................................MARKED

12   Exhibit 5        Oregon Criminal Justice         12

13                    Information Records Inquiry

14                    System

15   Exhibit 6        Lane County Sheriff's Office     48

16                    Calls for Service

17                    Information

18

19   MARKED TEXT.............................PAGE/LINE

20   None.

21

22

23

24

25
```

Defendant's Ex. 3
p. 003

```
 1                    (Noah Perez not present.)

 2

 3                    THE VIDEOGRAPHER:  We're going on the

 4    record.  Today is Thursday, October the 23rd, 2025.

 5    The time on the camera indicates 1:07.

 6                    This is the deposition of Daniel

 7    Miller in the matter of Gilliam versus Miller.  The

 8    case number is 6:25-cv-00492.

 9                    At this time I would ask to have

10    counsel identify themselves, and then we'll have the

11    witness sworn in, please.

12                    MS. DUGAN:  Marianne Dugan for the

13    plaintiff.

14                    MR. MURDOCK:  Casey Murdock for

15    Defendant.

16

17                    DANIEL MILLER,

18     having been first duly sworn to testify the truth,

19       the whole truth, and nothing but the truth, was

20              examined and testified as follows:

21

22                    EXAMINATION

23    BY MS. DUGAN:

24       Q.    Good afternoon.  Is it Sergeant Miller?

25       A.    It is.  Yes, ma'am.
```

Defendant's Ex. 3
p. 004

Daniel Miller

25

```
1      that day.

2          Q.     Okay.

3                 For the City of Coburg?

4          A.     Yes, ma'am.

5          Q.     Okay.

6                 Do you have any text messages from that

7      day or other --

8          A.     Oh, I'm sure I don't.

9          Q.     Okay.

10         A.     I don't have that device anymore.

11         Q.     Okay.

12                So what do you first recall -- I presume

13     you heard something on dispatch about this call.

14     Correct?

15         A.     Yes, ma'am.  I was dispatched to this

16     call.

17         Q.     Okay.

18                Do you remember -- do you recall if the

19     dispatcher mentioned the race of the subject?

20         A.     I don't recall.

21         Q.     Okay.

22         A.     Yeah.  I don't recall.

23         Q.     All right.

24                And do you recall at what point you

25     realized the caller was Simon Gayles?  Was it on
```

Defendant's Ex. 3
p. 005

Daniel Miller

1    citation, whether handcuffs be applied, whether a

2    show of force by using a weapon or displaying a

3    weapon -- anytime anything like that happens this

4    report occurs.

5        Q.    Okay.  Got you.

6            Let's see.  So where it says "use of force

7    used" kind of a little bit above the middle, and you

8    say "rifle displayed," and the word "rifle" is

9    circled --

10       A.    Uh-huh.

11       Q.    -- and it says "effective," and you said

12   "yes," can you describe to me what you meant by

13   that?

14       A.    Well, I displayed my rifle, and he

15   complied with my commands, so, yes, it was

16   effective.

17       Q.    Okay.

18           And then M4, which is mentioned down

19   below, that's a long gun?

20       A.    It is.  It's a -- commonly used.  It's

21   what Mr. Gilliam referred to as an AR-15.  It's the

22   same model.  Yes, ma'am.

23       Q.    Turning to the second page, which is the

24   first part of the Incident/Custody Report, so under

25   involved persons -- person -- Mr. Gayles is listed

1    reliable?

2        A.    He had injuries consistent with his

3    statement.

4        Q.    The nose?

5        A.    That's correct.

6        Q.    Okay.

7        A.    And witness statements corroborated that

8    as well.

9        Q.    Okay.

10            So other than that incident where he was

11   the victim of having his nose bitten, was there any

12   other time you took a statement from him?

13       A.    Not from him.

14       Q.    Okay.

15            All right.  Going back to Exhibit 4, on

16   page -- at the bottom it's 0004 -- the second

17   paragraph you say (as read):  Due to the

18       emergent nature of the call, I pulled my

19       vehicle approximately one half block closer

20       and deployed my long rifle.

21            So due to the emergent -- was one reason

22   you deployed your long rifle because of the emergent

23   nature of the call?

24       A.    It was a report of an armed burglary so,

25   yes, ma'am.

Daniel Miller

32

```
 1        Q.    So when you say "emergent," did you mean

 2    emergency?  Or what do you mean by "emergent"?

 3        A.    Yes, ma'am.

 4        Q.    Okay.

 5              So the long rifle -- tell me -- because

 6    I'm not -- I'm not in your shoes -- why would you

 7    use the long rifle instead of a gun?

 8        A.    It gives me an advantage as far as fire

 9    power, generally speaking.  It gives me an advantage

10    as far as distance.  I could engage a target at a

11    longer distance and still be able to observe the

12    entire surroundings.  It gives me a more accurate

13    platform should I need to use it.  It's tactically

14    advantageous.

15        Q.    Okay.

16              Later in that paragraph you say

17    (as read):  Responding cover units were

18    already en route.

19              Do you recall how many officers eventually

20    arrived on scene?

21        A.    A lot.

22        Q.    A lot?

23        A.    I don't have a number for you.

24        Q.    Okay.

25        A.    I never did take a tally or anything.  I
```

Defendant's Ex. 3
p. 008

Daniel Miller

39

1    taken to the most rearward part too keep them safe

2    and to keep us safe and they are usually placed in a

3    vehicle which frees up the officer -- or the other

4    officer and is able to keep them contained, or from

5    leaving, or from doing anything else, yeah.

6        Q.    And the vehicle is locked so that person

7    can't get out?

8        A.    Yes.  And -- yes.

9        Q.    Okay.

10            They can't get from the back into the

11    front uneven if they were unhandcuffed?

12        A.    Our vehicles you cannot because there's a

13    partition.

14        Q.    Okay.

15            So the vehicle he was in . . .

16        A.    I think it had a partition in it, but I'm

17    not sure.

18        Q.    Okay.

19            At some point -- at some point there was a

20    phase where there was an investigation going on.

21    Correct?

22        A.    Oh, yeah.

23        Q.    And were you the person -- the officer

24    doing the investigation?

25        A.    Yes.

Defendant's Ex. 3
p. 009

1        Q.    Okay.

2              That middle paragraph, the final sentence

3        (As read):  Upon the suspect's arrival, Gayles

4        told me he threatened his life -- meaning

5        Mr. Gilliam -- and made affirtive [sic]

6        movements.

7              What did you mean by "affirtive"?

8              A.    Quick moving movements to his pockets.  I

9     believe without -- I mean, I don't -- I think that's

10    what Simon actually said.

11       Q.    Oh, he said the word?

12       A.    I believe that's what he -- if my memory

13    serves me correctly.

14       Q.    Had you heard that word before?

15       A.    It's a common term we use.

16       Q.    Okay.

17             Could you mean "furtive," F-U-R-T-I-V-E?

18       A.    That's what I took it as.

19       Q.    In the next paragraph you say (as read):

20    I asked dispatch to notify my supervisor,

21    Sergeant Lee, due to the high volume of law

22    enforcement in the area so he would be aware

23    of any questions the citizenry may have.

24             Can you explain what you mean by -- what

25    was the purpose of the call to your supervisor?

Defendant's Ex. 3
p. 010

1       A.    Absolutely.  So any -- the city of Coburg,

2    generally speaking, is very quiet.  This is

3    something that they are -- the citizenry is not

4    accustomed to, so I knew that there would be calls

5    to Mayoral staff, city administrators, and to

6    mitigate that I thought it would be best to notify

7    my supervisor of what was occurring.

8       Q.    In the next paragraph you say

9    (as read):  Sergeant Lee --

10         Sorry.  Two paragraphs down -- because now

11    Sergeant Lee arrives on the scene (as read):

12       Sergeant Lee and I escorted Simon Gayles back

13       to my patrol vehicle to obtain his statement.

14         So at this point you're doing an

15    investigation of Mr. Gayles' allegations?

16       A.    Yes, ma'am.

17       Q.    Okay.

18         So on the next page, which at the bottom

19    says 0005, that first full paragraph (as read):  At

20       this time I went back to my patrol vehicle

21       to speak with the suspect, Gilliam.

22         So was he in your patrol vehicle?

23       A.    No.  But the patrol car he was in had been

24    moved up close to mine.

25       Q.    Okay.

Defendant's Ex. 3
p. 011

Daniel Miller

42

```
 1              So at this point you're still kind of --
 2    you're in investigative mode?
 3         A.    Yes, ma'am.
 4         Q.    Okay.
 5              In the next paragraph he kind of gives his
 6    side of the story.
 7              In the next paragraph (as read):  At
 8       this time I advised Gilliam of his Miranda
 9       rights.
10              Why did you do that?
11         A.    Because he was a suspect in a crime that I
12    was investigating.  I was asking him accusatory
13    questions.
14         Q.    Okay.
15         A.    And he was in custody.
16         Q.    He was in custody?  Okay.  So he wasn't
17    under arrest yet?
18         A.    No, ma'am.
19         Q.    And you never Mirandized Mr. Gayles.
20    Correct?
21         A.    I'm sorry?
22         Q.    You never Mirandized Mr. Gayles?
23         A.    No, ma'am.
24         Q.    Why not?
25         A.    He wasn't a suspect.
```

1      Q.    At no point?

2      A.    No, ma'am.

3      Q.    Until you wrote your report and referred

4   it out?

5      A.    Well, Mr. Gilliam asked me to do that, and

6   I would agree that, you know, maybe there's some

7   merit there.

8      Q.    Okay.  Okay.

9            So then a repo guy shows up.  Correct?

10     A.    Yes, ma'am.

11     Q.    Somebody should write a movie script.

12     A.    He can't make this stuff up, no.

13     Q.    He can't make this stuff up.  Okay.

14           The next paragraph (as read):  I had

15      Gilliam sit back in the patrol vehicle.

16           So when you were interviewing him was

17   he -- you say you had him step out of the car, so he

18   was outside of the vehicle while you interviewed

19   him?

20     A.    I don't recall.

21     Q.    Okay.

22           Then you had him sit back in the patrol

23   vehicle.  He was still cuffed but now he had the

24   double cuffs on?

25     A.    I know that I placed him in double cuffs.

Defendant's Ex. 3
p. 013

Daniel Miller

44

```
1    I just don't recall the sequence of events.

2         Q.    He wasn't uncuffed when you left him in --

3         A.    No, ma'am.

4         Q.    Okay.

5               THE WITNESS:  My apologies.

6               THE REPORTER:  Yeah, if you guys could

7    stop talking over each that would be great.

8    BY MS. DUGAN:

9         Q.    Okay.  All right.

10              So then you interviewed the neighbor,

11   David Straub?

12        A.    Yes, ma'am.

13        Q.    And then the female person who was

14   videoing interacted with you?

15        A.    Yes.

16        Q.    And then you tried to contact Mr. Gayles'

17   mom?

18        A.    Yes.  I was trying to contact anybody

19   inside of that house.

20        Q.    Okay.

21              Then you spoke with the female subject who

22   was filming and provided her with your business

23   card, struck up a conversation with her to calm her

24   down.

25              Why did you strike up a conversation?  Why
```

Defendant's Ex. 3
p. 014

Daniel Miller

1    did you need to calm her down?

2        A.    Well, there was several reasons for that.

3    Community caretaking for one.  Two, she might have

4    been a witness.  Three, she was borderline

5    interfering, and I thought it would be easier and

6    faster to have that conversation with her than to

7    have to arrest her as well.

8        Q.    Okay.

9              So you thought she might be a witness, but

10   on body cam I don't believe you asked her if she

11   observed anything.

12       A.    That is actually a technique.  Sometimes

13   it's best just to let people talk and they'll tell

14   if they observed anything without actually telling

15   you they observed anything.

16       Q.    Okay.

17             But you didn't outright just say, "Did you

18   see anything?"

19       A.    No.

20       Q.    Okay.

21             In the next paragraph (as read):  I

22   advised Sergeant Lee of my findings, and we

23   determined we no longer had probable cause

24   for the arrest of Gilliam.

25             What were your findings that you recall

Defendant's Ex. 3
p. 015

1    telling him?

2        A.    I don't recall.  We spoke back-and-forth

3    about my findings.  I recall saying that I no longer

4    had probable cause for his arrest.

5        Q.    Okay.

6              So then the next page -- the final page

7        (As read):  Action Recommended: Forward to

8        city prosecutor for review of possible

9        Initiating of a False Report.

10             You said that was at the request of

11   Mr. Gilliam.  When did he ask you to do that?

12       A.    After our contact was essentially done and

13   I was walking with him back to his vehicle he says,

14   "What about -- what about Simon?  Well, what about

15   finishing [sic] a false police report?"

16             I was considering that, and I thought,

17   well, that might have merit, so I thought I would

18   send it to the prosecutor to see if they agreed or

19   not.

20       Q.    Okay.

21             And did the prosecutor get back to you?

22       A.    They did not.

23       Q.    Did you ever email or call the prosecutor

24   to follow up?

25       A.    No, ma'am.  I had forgotten I -- I mean,

Defendant's Ex. 3
p. 016

Daniel Miller

48

```
 1                    (Deposition Exhibit 6

 2               marked for identification.)

 3    BY MS. DUGAN:

 4         Q.    I'm showing you what's marked as Exhibit

 5    6.  I guess this is the dispatch call -- the record

 6    of the dispatch from the Sheriff's Office.

 7                    So it's talking about who we now know as

 8    Mr. Gayles whispering that there's a male there with

 9    a gun.

10                    So the fifth thing down I think is

11    probably unrelated.  It says (as read):

12         Most recent location history following up

13         on OCA Waker Point homicide?

14         A.    I couldn't tell you.

15         Q.    Okay.

16                    Something unrelated, I'm guessing?

17         A.    Right.

18         Q.    Okay.

19                    Down -- the time stamp is 16:49:30, it

20    starts with the number 864.  Is that your badge

21    number?

22         A.    Yes, ma'am.

23         Q.    Okay.

24         A.    Where are you looking?  I'm sorry.

25         Q.    So there's the time stamps -- the time
```

Defendant's Ex. 3
p. 017

Daniel Miller

51

1    were -- was it directed at you or did you tell

2    them -- tell dispatch that you would respond?

3         A.    No.  It was my call.  It was -- they would

4    say 864, which is my call sign, and then a call.

5         Q.    Because you're in Coburg, you're the only

6    officer?

7         A.    That's correct.  That's correct.  Yes,

8    ma'am.

9         Q.    Okay.

10          So when you heard the details of the

11    call -- and just so I understand, this exhibit we

12    just looked at, it's all just kind of shorthand but

13    there's also radio traffic, correct, that's a little

14    more detailed?  Like the words on the radio aren't

15    all getting written down here?

16         A.    Right.

17         Q.    Okay.

18          So when you first got the call do you --

19    did you believe you had reasonable suspicion of a

20    crime in progress?

21         A.    Reasonable suspicion -- when I got the

22    call?

23         Q.    Yeah.

24         A.    Yeah, based on what was relayed to me.

25         Q.    Right.

Defendant's Ex. 3
p. 018

1         And then did you -- did you think you had

2    probable cause of a crime that was underway as

3    different from reasonable suspicion?

4         A.    Yes.

5         Q.    Okay.

6         And when you learned that Mr. Gayles was

7    the caller that didn't change that analysis.

8    Correct?

9         A.    No.

10        Q.    Okay.

11        After Mr. Gilliam was handcuffed and

12   patted down did that change your analysis as to

13   whether there was reasonable suspicion of the crime

14   involving the alleged gun or probable cause?

15             MR. MURDOCK:  Object to the form.

16   BY MS. DUGAN:

17        Q.    You can still answer.

18        A.    No, it doesn't change anything at that

19   point.  It just didn't -- he just didn't have a gun

20   on him.

21        Q.    Okay.

22        So tell me -- when you got the call and

23   you're headed there, what possible crimes are you

24   thinking of in your head?

25        A.    There could be a slew of crimes.

Defendant's Ex. 3
p. 019

Daniel Miller

53

```
 1        Q.    Sure.  Menacing?

 2        A.    Yeah, Menacing.  You have potential

 3    Unlawful Use of a Weapon.  Disorderly Conduct.

 4    Harassment.  Robbery.  A Burglary.  I mean, it could

 5    go anywhere.

 6        Q.    Okay.

 7              So after you learned that there were no

 8    guns on Mr. Gilliam did that eliminate any of the --

 9    probable cause for any of those crimes?

10        A.    After no guns were found on him?

11        Q.    Uh-huh.  Yeah.

12        A.    I would say it would start to diminish

13    Unlawful Use of a Weapon but not -- it's definitely

14    not ruled out.

15        Q.    Okay.

16              And then when you saw that the item that

17    had been in his hand was a wallet, did that change

18    the analysis at all on any of those crimes?

19        A.    You mean once we moved up further?

20        Q.    Yeah.  After he was cuffed, taken away,

21    and then you walked by the wallet and saw --

22        A.    I would say that would help also to

23    diminish the Unlawful Use of a Weapon.

24        Q.    Okay.

25              So Mr. Gilliam is in the car cuffed.  Then
```

Defendant's Ex. 3
p. 020

1    Q.    For anything?  I mean, you guys didn't

2    discuss Harassment or Disorderly?

3    A.    So I believe that the probable cause still

4    existed for Disorderly Conduct.  We chose -- we

5    choose not to prosecute low level crimes like this.

6    It's just not feasible, really, and were not

7    applicable sometimes.  Just because we have a crime

8    or probable cause for a crime doesn't mean we have

9    to enforce it unless it's a Measure 11 or an APA.

10    Q.    APA?  Sorry.

11    A.    Assault Prevention Act.  I'm sorry.

12    Q.    Oh, the -- like domestic violence?

13    A.    Yes.  That's correct.

14    Q.    Right.  Right.

15          But on your body cam you said to your

16    sergeant, "I don't know I have probable cause for

17    shit right now."  Correct?

18    A.    Yeah, I said that.

19    Q.    Okay.

20          And he said, "I don't think you do

21    either."

22          None of you -- neither of you discussed

23    what you just told me about Disorderly and

24    Harassment.  Correct?

25    A.    Not at that time.

Defendant's Ex. 3
p. 021

1    State of Oregon     )
                        )        ss.
2    County of Lane      )

3

4        I, Sara Fahey Wilson, CSR, a Certified Shorthand

5    Reporter for the State of Oregon, certify that the

6    witness was sworn and the transcript is a true

7    record of the testimony given by the witness; that

8    at said time and place I reported all testimony and

9    other oral proceedings had and foregoing matter;

10   that the foregoing transcript consisting of 63 pages

11   contains a full, true and correct transcript of said

12   proceedings reported by me to the best of my ability

13   on said date.

14       If any of the parties or the witness requested

15   review of the transcript at the time of the

16   proceedings, such correction pages are attached.

17       IN WITNESS WHEREOF, I have set my hand this 6th

18   day of November 2025, and City of Eugene, County of

19   Lane, State of Oregon.

20

21

22   _Sara Fahey Wilson_

23   Sara Fahey Wilson, CSR

24   CSR No. 06-0400

25   Expiration Date:  March 31st, 2026

Defendant's Ex. 3
p. 022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served the foregoing **DECLARATION OF CASEY MURDOCK IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT and EXHIBITS 1-3**:

> Marianne G. Dugan
> Civil Liberties Defense Center
> 1711 Willamette Street, Suite 301, #359
> Eugene, OR 97401
> mdugan@cldc.org

☒     by automatic electronic transmission via the Court's Case Management and Electronic Case Filing practice.

☐     by mailing to said attorneys a copy thereof, certified by me as such, contained in a sealed envelope, with postage paid, addressed to said attorneys at said attorneys' last known address and deposited in the post office at Medford, Oregon, on the date set forth below.

☐     by emailing said attorney a copy thereof, certified by me as such, addressed to said attorney at said attorney's last known email address as indicated above.

Dated this 12th day of January 2026.


                 */s/ Casey Murdock*_____
                 Casey S. Murdock, OSB No. 144914
                 *Of Attorneys for Defendant*