Marianne Dugan, OSB # 932563
Email: mdugan@cldc.org
CIVIL LIBERTIES DEFENSE CENTER
1711 Willamette Street Ste 301 # 359
Eugene, OR  97402
Telephone:  541-687-9180
    Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

ADAM GILLIAM,                                     Case No. 6:25-CV-00492-AP

        Plaintiff,

                                                  PLAINTIFF'S RESPONSE TO DEFENDANT'S
    v.                                            MOTION FOR SUMMARY JUDGMENT

DANIEL C. MILLER,                                 ORAL ARGUMENT REQUESTED

        Defendant.

Plaintiff hereby responds to Defendant's Motion for Summary Judgment.

## STATEMENT OF FACTS

On March 25, 2023, Plaintiff Adam Gilliam went to Simon Gayles' home to inquire about a

flooring job Plaintiff's girlfriend had hired and paid Mr. Gayles for, but which Gayles had never

been completed. Ex. A (Gilliam Depo. Tr.) 33:11-14. During this encounter, Plaintiff spoke with

Mr. Gayles's stepmother for several minutes and with a neighbor for two to three minutes. *Id.* at

35:9-16. In Plaintiff's conversation with the stepmother, he apologized for arriving unannounced

and without her permission, to which she responded that she understood. *Id.* at 38:5-12.

Next, Mr. Gayles' neighbor came outside, and Plaintiff again apologized for any

disturbance. *Id.* at 42:23-24. Plaintiff remained calm and polite throughout his interactions with Mr.

Gayles, his stepmother, and his neighbor.

During the brief conversation with the neighbor, Plaintiff observed the Defendant, Coburg

Officer Daniel Miller, pointing a M4 rifle right at him. *Id.* at 46:12-17. Defendant then ordered

PAGE  1  - PLAINTIFF'S RESP TO DEF'S MO. FOR SUMMARY JUDGMENT

Plaintiff to get on his knees for several minutes, which Plaintiff did; and, after being on his knees for a period of time, he was placed in handcuffs. Exhibit B (Miller Depo. Tr.) 33:7-10; Exhibit C (bodycam videos).

Plaintiff, an older Black man with significant health issues, complied with police orders, and remained calm while police searched him for a weapon that undisputedly did not exist. *Id.* at 35:2-5, 36:5-13; Exhibit A at 21:23-25. Indeed, Defendant quickly determined that the only thing Plaintiff had been holding was a wallet.

Despite this, Plaintiff was kept handcuffed behind his back in the back of a police car for ninety minutes. This caused him a great deal of pain and discomfort, given that he was over six feet tall and 250 pounds, and had just received dialysis through a very prominently observable port in his arm. Ex. D police report at 1, 2; Ex. A at 21:23-25, 49:3-7; Ex. C.

In contrast, although Gayles, a white man who was known to Defendant as someone who uses illegal narcotics and has guns, was also eventually handcuffed during Defendant's investigation, was uncuffed after only 19 minutes. Ex. B at 29:18-22, 54:12, Ex. C. Indeed, Defendant uncuffed Gayles even while a search for a weapon was ongoing. Exhibit B at 57:15-22.

Relevant points in the bodycam (submitted on a flash drive as Exhibit D) are as follows (with informal transcription):

Video E11210_E11209_BCU_N38950_2023-03-25_234912000_658278276 -- starts 4:49 pm –

4:49 pm – Miller points rifle at Gilliam.

4:57 – Miller tells Gilliam to get on his knees; he does; other people handcuff him.

5:03 – Miller handcuffs Simon Gayles (the person who called police).

5:19 – Miller states: "We don't even know if he was armed – this is what he had in his hand – a wallet – hahaha." [and similar statements shortly before].

PAGE 2 - PLAINTIFF'S RESP TO DEF'S MO. FOR SUMMARY JUDGMENT

5:22 – Gayles is released (after 19 minutes).

5:33 – Miller takes bullets out, at cop car, and starts taking Gayles' story.

5:27 – "Need to find the suspect and get him ID'd."

Video E11211_E11209_BCU_N38950_2023-03-26_002912000_-1251791077 –

5:29 – Still taking Gayles' story (uncuffed).

5:30 – "Did he have a weapon on him?" "Not that we found."

5:36 – Bringing other officer up to speed – admits no gun was found when they put Gilliam in cop car.

5:37 – "May have a menacing. Haven't even ID'd him yet."

5:37 – Opens police car door; Gilliam is seated, cuffed. He calmly states: "My shoulders are hurting." Gets out of car, standing, still cuffed. He is patted down. "They already did that." Tells his side of the story.

5:40 – Miranda given.

"No, I didn't threaten or even raise my voice. Ask the stepmom – she was there."

5:43 – "Can you loosen the cuffs?" They put an extra set on. "What's this bandage?" "Dialysis."

Miller leaves Gilliam in the vehicle (still handcuffed behind his back).

5:45 – "This guy was completely cooperative when I got here" (referring to Gilliam). Other officer – "Just wanted to make sure this other guy isn't a suspect?" (referring to Gayles). "He's a victim."

5:47 – Another person shows up, apparently coincidentally, to repossess Gayles' vehicle – Miller asks Gilliam: "Do you have keys to his truck? He says you do." "He doesn't know what he's saying."

5:48 – Neighbor – David Straub - talking about Gilliam – "He was calm and collected. Simon [Gayles] was agitated. No, the black guy wasn't chasing, just was walking fast."

5:50 – "I heard no threats. Voice elevated only to match Simon's."
(Gilliam still cuffed in the vehicle).

5:51 – Miller knocks on Gayles' door.

5:52 – A woman is videotaping Miller, and is upset at being told to back off.

5:54 – Miller gives the "back story" to her.

5:55 – She videotaping woman is berating Miller. He talks about "First Amendment Auditors" with her until 5:57.

5:58 -- Miller shakes her hand.

5:59 – Miller speaks with his Supervisor, Sergeant Lee. "Did you talk to mom?" "She wouldn't come to the door." "I don't know I have PC for shit right now." Supervisor - "I don't think you do either." "My intent is cut him loose, write it up."

Video E11213_E11212_BCU_N38950_2023-03-26_010126000_-977379793

6:02 – Gilliam is finally uncuffed and released.

6:05 – Miller gives Gilliam back his phones and sweater.

As noted above, about thirty minutes into the encounter, Defendant acknowledged on body-worn camera that there was no weapon found on or near Plaintiff, only his wallet. Three minutes later, Gayles was uncuffed – this despite the fact that Defendant notes he ended up referring Gayles to be charged for false reporting. Ex. D at 5; Ex. B at 46:6-19. Yet Defendant continued to keep Plaintiff handcuffed behind his back in the locked police car for another 40 minutes, for a total of over an hour in handcuffs, seated uncomfortably in the back of a police car with his hands behind his back.

Forty minutes into the encounter, Plaintiff calmly explained that being cuffed behind his back while seated in a police car was hurting his shoulders. At this point, there was no articulable safety need for the handcuffs, but they were not removed.

Shortly after that, Plaintiff told Defendant he recently had dialysis – his bandage was still on his shoulder and was obvious. Defendant still did not remove the cuffs, although the officers did take the time to loosen the handcuffs -- an hour into the restraint.

Around then, one hour into the encounter, a neighbor told the police that before the police

arrived, Mr. Gayles was agitated, while Plaintiff was calm, and did not chase Gayles as Gayles had alleged. Additionally, contrary to what Gayles had reported, the neighbor stated he did not hear Plaintiff make any threats to Gayles.

During this extended period of time when Plaintiff remained cuffed, Defendant inexplicably also took more than five minutes out of his investigation time to debate with a bystander about the First Amendment right to videotape the police – something he could have postponed until after uncuffing Plaintiff, when by now clearly there was no probable cause of a crime.

About one minute after shaking the hand of the First Amendment videographer, Defendant tells his supervisor, "I don't know I have PC for shit right now." His supervisor (Sgt Lee) responded, "I don't think you do either." Defendant Miller stated: "My intent is cut him loose, write it up." About three minutes later, Defendant finally uncuffed and released Plaintiff.

This was an investigatory detention, not an arrest, by Defendant's admission and characterization. In his deposition, Defendant testified as follows (all citations are to Ex. B -- Miller depo Tr.):

at 42 --

7 In the next paragraph [of police report]: At
8 this time I advised Gilliam of his Miranda
9 rights.
10 Why did you do that?
11 A. Because he was a suspect in a crime that I
12 was investigating. I was asking him accusatory
13 questions.
14 Q. Okay.
15 A. And he was in custody.
16 Q. He was in custody? Okay. So he wasn't
17 under arrest yet?
18 A. No, ma'am.

Ex. B at 59-60:

19 So at some point on the body

PAGE 5 - PLAINTIFF'S RESP TO DEF'S MO. FOR SUMMARY JUDGMENT

20 cam you say to your sergeant -- sorry. Was he a
21 sergeant?
22 A. He was. Yes, ma'am.
23 Q. -- "I don't think I have probable cause."
24 Correct?
25 A. That's correct.
1 Q. For anything? I mean, you guys didn't
2 discuss Harassment or Disorderly?
3 A. So I believe that the probable cause still
4 existed for Disorderly Conduct. We chose -- we
5 choose not to prosecute low level crimes like this.
6 It's just not feasible, really, and were not
7 applicable sometimes. Just because we have a crime
8 or probable cause for a crime doesn't mean we have
9 to enforce it unless it's a Measure 11 or an APA.
10 Q. APA? Sorry.
11 A. Assault Prevention Act. I'm sorry.
12 Q. Oh, the -- like domestic violence?
13 A. Yes. That's correct.
14 Q. Right. Right.
15 But on your body cam you said to your
16 sergeant, "I don't know I have probable cause for
17 shit right now." Correct?
18 A. Yeah, I said that.
19 Q. Okay.
20 And he said, "I don't think you do
21 either."
22 None of you -- neither of you discussed
23 what you just told me about Disorderly and
24 Harassment. Correct?
25 A. Not at that time.

Ex. B at 61-62:

9 So once you determined he did not have a
10 weapon on him why did you keep him cuffed in the
11 locked police car?
12 A. I was not back with him. I was -- left
13 him in the custody of another officer -- or a
14 deputy.
15 Q. And you didn't have a discussion with that
16 deputy about whether he should be cuffed or not
17 cuffed?
18 A. He's still a suspect.
19 Q. Well, was this an investigative detention
20 or an arrest?

PAGE 6 - PLAINTIFF'S RESP TO DEF'S MO. FOR SUMMARY JUDGMENT

21 A. It was investigative.
22 Q. Okay.
23 And he wasn't -- at that point there was
24 nothing making him unsafe -- you know, a safety risk
25 for officers or others or a flight risk. Correct?
1 MR. MURDOCK: Object to the form.
2 A. I have no idea. I wasn't back there with
3 him.
4 BY MS. DUGAN:
5 Q. And then when you went back there and
6 interviewed him you did put on an extra cuff?
7 A. Yes.
8 Q. But you kept him cuffed?
9 A. Yes.
10 Q. Okay.
11 So when you were with him then and put him
12 back in the car in cuffs he did not present a safety
13 risk for officers or others or a flight risk.
14 Correct?
15 MR. MURDOCK: Object to the form.
16 BY MS. DUGAN:
17 Q. You can answer.
18 A. No, because he was detained.
19 Q. For an investigative detention, not
20 arrest?
21 A. Right. He wasn't under arrest.

The City of Coburg has 0% Black or African American residents, is 87.65% white,[1] and does not appear to have any Black or BIPOC police officers.[2] Yet in 2022-2023 3% of Coburg police "stops" were of Black people – compared to Coburg's Black population of zero.[3] Nearly 19% of Coburg police encounters were with racial minorities, compared to Coburg's 12.3% minority population.

**<u>STANDARD</u>**

---

[1] https://worldpopulationreview.com/us-cities/oregon/coburg

[2] https://www.coburgoregon.org/police/page/police-department-personnel

[3] https://www.oregon.gov/cjc/CJC%20Document%20Library/STOP_Report_2023.pdf

Plaintiff agrees with Defendant's statement regarding the standard for summary judgment, but adds the following important case-specific authority. Specifically, 1) a reasonable jury could find that Plaintiff was over-detained, in violation of his Fourth Amendment rights; 2) Defendant Miller's claim that an investigation was ongoing, and that officer safety required continued cuffing in the back of the locked police car, are questions of fact that must be decided by the jury; and 3) whether Defendant's detention of Plaintiff violated the Equal Protection Clause is a disputed issue material fact reliant upon circumstantial evidence. Finally, the law on these issues was clearly established at the time of Defendant's detention of Plaintiff.

I.      **A Reasonable Jury Could Find that the Detention Was an Overlong Investigatory Detention**

Defendant asserts that the detention was a *Terry* stop and did not become a *de facto* arrest. That is a contested material issue of fact. And, even if it was a *Terry* stop, a reasonable jury could find that the detention was over-long.

Under the Fourth Amendment, there are two relevant categories of seizures: *Terry* stops and arrests. A *Terry* stop must be motivated by reasonable suspicion of criminal activity, and questioning of a suspect must be limited to investigatory questions. *United States v. In*, 124 F.4th 790, 794 (9th Cir. 2024). Further, the scope of the detention must be carefully tailored to its underlying justification. *Id.*

If, as Defendant states, the 911 call justified the initial use of handcuffs in detaining Plaintiff, a reasonable jury could easily find that the concern for officer safety (and, as discussed *infra,* probable cause), dissipated when Plaintiff was discovered to be unarmed, was completely cooperative, and was then placed in the locked back seat of a police car -- and that therefore Defendant acted in violation of the Fourth Amendment.

An officer's suspicion that a subject may have committed a crime does not on its face

justify extensive use of restraints during an investigation. *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990). In that case, officers suspected that Del Vizo was involved with drug trafficking. *Id.* As in this case, there was no evidence that Del Vizo failed to comply with police orders. *Id.* Most importantly, the Ninth Circuit held that there was no valid officer safety concern after Del Vizo had been searched and was lying on the ground, complying with the officer's orders. *Id.* In this case, as in *Del Vizo*, a reasonable jury could find that there was no valid officer safety concern when Plaintiff after searched and complied with order; no weapon was located; and Plaintiff was locked in the back of a police car.

The defense relies on *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009), for the proposition that the purpose of a *Terry* stop is to allow an officer to investigate without fear of violence. What the defense fails to mention is that handcuffing and other uses of force based on officer safety concerns must be reasonable. In *Guzman-Padilla*, the court further broke down the analysis to determine whether a seizure fits into the "investigative detention framework" of a *Terry* stop. *Id.* First, an inquiry should be made from the perspective of the person being detained to determine whether that person could reasonably have believed they were free to go and that they were being taken into custody. *Id.* Obviously Plaintiff, handcuffed behind his back, in the back of a locked police car, reasonably believed he was not free to leave and that he was in custody.

The next inquiry is from the officers' perspective, to determine whether the force was in response to legitimate safety concerns. *Id.* A reasonable jury could easily find that Defendant did not have a legitimate safety concern, as Plaintiff had never been armed and was compliant and locked safely in the back of the police car.

In *Sialoi v. San Diego*, the Ninth Circuit held that officers who were responding to a call about a subject with a firearm violated the Fourth Amendment by continuing the seizure past the

point where they determined the detainee did not have a real gun, but a toy. 823 F.3d 1223, 1233

(9th Cir. 2016). Similarly, a reasonable jury could find that, when Defendant determined that

Plaintiff was unarmed, belying the "victim's" allegations in the 911 call, and subsequently found

that what Plaintiff had been holding was only a wallet, Defendant violated the Fourth Amendment

by continuing the seizure and unnecessary restraint of Plaintiff. Compounding the

unreasonableness of the continued cuffing was Defendant Miller's prior knowledge of the caller's

character and reputation.

      The detention in this case was not carefully tailored to its underlying justification, as

required by the Supreme Court. In *Florida v. Royer*, the Supreme Court clearly limited *Terry* stops

to a length of time "no longer than necessary to effectuate the purpose of the stop." 460 U.S. 491,

500 (1983).

      More recently, the Ninth Circuit held ,in *Chinaryan v. City of Los Angeles*, that officers

kept the plaintiff, her teenage daughter, and their friend handcuffed for nine minutes after the

officers' continued suspicion was no longer reasonable, when a DMV error became apparent. 113

F.4th 888, 901 (9th Cir. 2024) (citing *Royer*).

      In *United States v. Sharpe*, the Supreme Court set forth factors to consider in determining

whether the duration of a detention was unreasonable and violated the Fourth Amendment.

> In assessing whether a detention is too long in duration to be justified as an
> investigative stop, we consider it appropriate to examine whether the police
> diligently pursued a means of investigation that was likely to confirm or dispel
> their suspicions quickly, during which time it was necessary to detain the
> defendant . . . The question is not simply whether some other alternative was
> available, but whether the police acted unreasonably in failing to recognize or to
> pursue it.

470 U.S. 675, 686-87 (1985) (internal citations omitted).

      In this case, a reasonable jury could find that the defendant officer's investigative methods

were unreasonable based on the facts that developed immediately, and increased throughout the more than an hour caught on bodycam. A detention is lawful only to the extent necessary to confirm or dispel suspicion. *Id.* at 685-86. Defendant claims the detention was necessary to complete his investigation, but a reasonable jury could find not only that reasonable alternatives were available, but that Defendant acted unreasonably in failing to uncuff a fully cooperative and unarmed subject locked in the back of a police car.

In the instant case, after Plaintiff complied quickly with the demand to kneel down, Defendant learned the only thing in his hand had been a wallet. The complainant (Gayles) ran off, and when questioned, no corroborating evidence ensued. Defendant detained Plaintiff based on the complainant's 911 call that falsely claimed Plaintiff was armed and making threats – claims that were quickly found to be implausible, on top of the fact that the complainant was known to Defendant Miller as someone who used narcotics and often did not pay his bills. Ex. D at 3. Plaintiff then continued to remain painfully cuffed behind his back in the locked police car while Defendant dealt with matters outside the scope of the detention, including bantering with a "First Amendment auditor" videotaping him. Defendant also kept Plaintiff in cuffs behind his back in the car while Gayles' car was repossessed. Because Plaintiff remained detained while cooperating with police, well after he was found to be unarmed, and while the investigation was prolonged and sidetracked, a reasonable jury could find that the detention violated his rights.

## II.      A Reasonable Jury Could Find that Plaintiff Was Subjected to a De Facto Arrest, and that Probable Cause Dissipated While Plaintiff Remained Handcuffed

Even if Defendant is correct that the detention began as a lawful investigative stop, it became unlawful when a reasonable officer would have ended the detainment.

To determine whether a *Terry* stop has become a *de facto* arrest, the court must evaluate the

totality of the circumstances. *Id.* at 794-95. The Ninth Circuit has established that certain police actions that may not constitute an arrest with an uncooperative suspect can constitute a *de facto* arrest in situations where a suspect is cooperative. *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996). In *Washington*, the court held that the officers effected an arrest, not a *Terry* stop, and that they lacked probable cause in doing so. *Id.*

> In short, we decide whether the police action constitutes a *Terry* stop or an arrest by evaluating not only how intrusive the stop was, but also whether the methods used were reasonable *given the specific circumstances*. As a result, we have held that while certain police actions constitute an arrest in certain circumstances, *e.g.,* where the "suspects" are cooperative, those *same* actions may *not* constitute an arrest where the suspect is uncooperative or the police have specific reasons to believe that a serious threat to the safety of the officers exists. The relevant inquiry is always one of reasonableness under the circumstances.

*Id.* (internal citations and quotations omitted; emph. added).

If, as Defendant states, the 911 call justified the initial use of handcuffs in detaining Plaintiff, a reasonable jury could easily find that both probable cause, and the concern for officer safety, dissipated when Plaintiff was discovered to be unarmed, was completely cooperative, and was then placed in the locked back seat of a police car -- and that therefore Defendant acted in violation of the Fourth Amendment. A reasonable officer would have quickly recognized that prolonged detention was unreasonable, given the myriad of evidence eviscerating probable cause, and the rapidly developing evidence supporting the ultimate recommendation that charges be brought against Mr. Gayles, the 911 caller, for initiating a false report.

It is well-established that once officers determine that no criminal activity exists, the justification for detaining the suspect expires. As the Ninth Circuit has noted: "In some instances, there may initially be probable cause justifying an arrest, but additional information obtained at the scene may indicate that there is less than a fair probability that the defendant has committed or is committing a crime. In such cases, execution of the arrest or continuation of the arrest is illegal."

PAGE 12 - PLAINTIFF'S RESP TO DEF'S MO. FOR SUMMARY JUDGMENT

*United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007).

As the Ninth Circuit held in *United States v. Ortiz-Hernandez*:

A person may not be arrested, or must be released from arrest, if previously established probable cause has dissipated. "As a corollary . . . of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause."

427 F.3d 567, 574 (9th Cir. 2005) (citations omitted). *See also Nicholson v. City of Los Angeles*, 935 F.3d 685, 691 (9th Cir. 2019) (denying qualified immunity to officers who kept children handcuffed after it became apparent they were unarmed and were not engaged in criminal activity); *United States v. Beltran*, 799 F. Supp. 3d 1102, 1117 (S.D. Cal. 2025) (initial lawful detention turned unlawful once the officer learned that 911 caller's suspicions were not corroborated by *Terry* investigation).

In this case, a reasonable jury could find that probable cause dissipated once Defendant searched Plaintiff and realized he was unarmed – that Defendant knew Plaintiff was unarmed and that Gayles' claims were unsubstantiated; and therefore, that Plaintiff's continued detention was unlawful. A reasonable jury could find that probable cause dissipated once Defendant located the wallet Plaintiff had been holding when he arrived on the scene. And, a reasonable jury could find that – as Defendant admitted on bodycam – he had no probable cause – but much earlier than that admission was made, based upon the statements of the neighbor, Defendant's prior knowledge of the complainant's character, and the other factors constituting the "totality of circumstances." A reasonable jury could easily find that continuing the detention of Mr. Gilliam past any of these decision points was unlawful.

Even if this Court finds that the initial detention was reasonable, a reasonable jury could find that keeping Plaintiff in handcuffs behind his back, confined in the back of a locked police car, for 90 minutes, was unreasonable.

PAGE 13 - PLAINTIFF'S RESP TO DEF'S MO. FOR SUMMARY JUDGMENT

### III.    A Reasonable Jury Could Find that Defendant Violated the Equal Protection Clause

To succeed on an Equal Protection claim based on race, a plaintiff must prove that the defendant "acted in a discriminatory manner and that the discrimination was intentional." *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 948 (9th Cir. 2003) (citing *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000)). The federal courts have issued very little guidance regarding the summary judgment standard for racial profiling claims. In *Bingham*, the Ninth Circuit stated that in order for a plaintiff to survive summary judgment on such a claim, he must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that the officer's decisions were racially motivated. *Id.*

In general, where a plaintiff alleges a discriminatory motive, the law requires an "inquiry into such *circumstantial* and direct evidence of intent as may be available." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (emph. added). As the Ninth Circuit noted in *Mendocino Environmental Center v. Mendocino Environmental Center v. Mendocino County*:

> Direct evidence of improper motive or an agreement among the parties to violate a plaintiff's constitutional rights will only rarely be available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action. . . . Moreover, "[q]uestions involving a person's state of mind . . . are generally factual issues inappropriate for resolution by summary judgment." *Braxton-Secret v. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985).

192 F.3d 1283, 1302 (9th Cir. 1999) (citations omitted). *See also Washington v. Davis*, 426 U.S. 229, 242 (1976) (discriminatory purpose "may often be inferred from the totality of the relevant facts."); *Ferranti v. Moran*, 618 F.2d 888, 892 (1st Cir. 1980); *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997); *Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 427 (7th Cir. 1992); *Russell v. TG Mo. Corp.*, 340 F.3d 735, 746 (8th Cir. 2003); *Garrett v. Hewlett-Packard Co.*, 305

F.3d 1210, 1220 (10th Cir. 2002); *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1108 (11th Cir. 2001).

Moreover, the Ninth Circuit Model Jury Instruction 1.9 instructs juries that "[t]he law makes no distinction between the weight to be given to either direct or circumstantial evidence." 9th Cir. Model Civ. Jury Instr. 1.9 (2007).

The central purpose of the Fourteenth Amendment is the prevention of official conduct that discriminates on the basis of race. *Washington v. Davis*, 426 U.S. at 242. Purposeful discrimination that violates the Equal Protection Clause also violates 42 U.S.C. § 1981. *Gratz v. Bollinger*, 539 U.S. 244, 276 (2003). The Constitution forbids selective enforcement of the law based on race. *Whren v. U.S.*, 517 U.S. 806, 813 (1996).

The Ninth Circuit's *Bingham* decision held that the plaintiff had failed to show *sufficient* evidence to avoid summary judgment, because the circumstances of the traffic stop were insufficient to support an inference of racial discrimination. 341 F.3d at 948-49. The court reasoned that where the only evidence is that plaintiff "is African-American, the officer is white, and they disagree about the reasonableness of the traffic stop," those circumstances are insufficient to state an Equal Protection Claim. *Id*. at 948. Thus, the *Bingham* Court held that there was no genuine issue of material fact as to whether the officer's actions violated the Equal Protection Clause. *Id*. at 949. But the *Bingham* court did not address the importance of circumstantial evidence in such cases.

As in the Tenth Circuit decision in *Marshall v. Columbia Lea Regional Hospital*, 345 F.3d 1157 (10th Cir. 2003), the record here contains a number of facts from which a jury could draw reasonable inferences that defendant's actions were racially motivated. A jury could reasonably infer that defendant knew plaintiff's race before the stop, or at least knew it immediately upon

PAGE 15 - PLAINTIFF'S RESP TO DEF'S MO. FOR SUMMARY JUDGMENT

pointing his gun at Plaintiff and ordering him to kneel. A reasonable jury could find that the manner in which Defendant treated the white, unreliable complainant – cuffed for only 19 minutes despite clearly making a false report – was unreasonably disparate compared to holding Plaintiff for over an hour cuffed behind his back in a locked police car. The racial statistics regarding Coburg Police Department stops is further circumstantial evidence supporting such a finding.

In *Marshall*, the Tenth Circuit cogently reasoned that, in the common situation where direct evidence of racial profiling does not exist, the plaintiff may survive summary judgment by relying on such evidence as statistics; the officer's behavior during the events in question; and (in the rare case where available), the record of the officer's other racially selective stops and arrests. The *Marshall* court noted that a racial profiling claim bears resemblance to a *Batson* challenge to a jury selection process. As the *Marshall* court noted: "In such cases, the Supreme Court has instructed that the court should 'consider all relevant circumstances,' including evidence which may 'support or refute an inference of discriminatory purpose.' *Batson v. Kentucky*, 476 U.S. 79, 96-97, 106 S. Ct. 1712."

## IV.    Defendant is Not Entitled to Qualified Immunity

The case law cited *supra* is long-standing, and long ago clearly established the law regarding over-detention, dissipation of officer safety and probable cause concerns, and equal protection factors.

For example, in *Nicholson v. City of Los Angeles*, 935 F.3d 685, 691 (9th Cir. 2019), years before Gilliam's detention, the Ninth Circuit denied qualified immunity to officers who kept children handcuffed after it became apparent they were unarmed and were not engaged in criminal activity. In *Meredith v. Erath*, 342 F.3d 1057, 1062-63 (9th Cir. 2003), the Ninth Circuit noted decades ago:

We have not previously addressed the reasonableness of detaining a person in handcuffs during the execution of a search warrant for evidence. [FN 4 – In *Franklin*, we held that the detention of an elderly, disabled man was unreasonable because of the length of the detention and "the treatment afforded the detainee during the detention." *Franklin*, 31 F.3d at 877. We did not address as a discrete inquiry whether it was reasonable to handcuff him. Nor did we address this issue in *Liston*, 120 F.3d at 977-79, or *Mena*, 226 F.3d at 1040-41 and 332 F.3d 1255 (9th Cir. 2003).] We have held, however, that the use of guns and handcuffs during an investigatory detention "must be justified by the circumstances." *Robinson v. Solano County*, 278 F.3d 1007, 1014 (9th Cir. 2002) (quoting *Baker v. Monroe Township*, 50 F.3d 1186, 1193 (3d Cir. 1995)). We held in *United States v. Bautista*, 684 F.2d 1286 (9th Cir. 1982), that the use of handcuffs was justified during a *Terry* stop to ensure officer safety from suspected violent criminals and to prevent their escape. *Id*. at 1289. We have also commented, in a case involving the detention of a suspect during a search for contraband, that "handcuffing substantially aggravates the intrusiveness" of a detention. *Washington v. Lambert*, 98 F.3d 1181, 1188 (9th Cir. 1996) (internal quotation marks omitted); *Bautista*, 684 F.2d at 1289 (same).

During searches for narcotics, courts have required a showing of justifiable circumstances for using handcuffs. *Compare Baker v. Monroe Township*, 50 F.3d 1186, 1193-94 (3d Cir. 1995) (holding that officers were not justified in handcuffing a mother and her teenage children who were approaching a residence where the officers were executing a search warrant for narcotics), *with Torres v. United States*, 200 F.3d 179, 185-86 (3d Cir. 1999) (permitting the use of handcuffs because "the agents had good reason to fear violence or destruction of evidence as they entered the appellees' home" to search for narcotics); *United States v. Fountain*, 2 F.3d 656, 663 (6th Cir. 1993) (same), *overruled on other grounds by Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 717 (6th Cir. 1999).

From the foregoing case law, we glean the rule that detaining a person in handcuffs during the execution of a warrant to search for evidence is permissible, but only when justified by the totality of the circumstances. To determine whether the circumstances justify handcuffing, we begin with a consideration of the factors articulated by the Court in [*Michigan v.] Summers*, [452 U.S. 692, 705, 101 S. Ct. 2587 (1981)] and by our court in *Ganwich [v. Knapp*, 319 F.3d 1115, 1122 (9th Cir. 2003)] cases in which there were detentions, but not in handcuffs. Because handcuffing "substantially aggravates the intrusiveness" of a detention, it follows that circumstances which would justify a detention will not necessarily justify a detention by handcuffing. More is required.

Here, taking the facts in the light most favorable to Bybee, the circumstances did not justify her detention in handcuffs. Prior to entering the Sunset Beach property, Agent Erath had no reason to believe that the occupants were dangerous. He was investigating tax related crimes, which, although felonies, are nonviolent offenses. According to Bybee's version of events, she was not a serious impediment to the search or a threat to Erath or anyone else. She simply asked, albeit loudly and several times, to see a search warrant. She made no attempt to flee. In these circumstances, Erath was not justified in detaining Bybee in handcuffs while he and the other IRS agents searched the Sunset Beach property. Bybee's detention in this manner violated the Fourth Amendment.

In *Meredith*, the Court went on to grant the defendant qualified immunity, but "clearly

established" the law from that date (2003) going forward:

> At the time of the search, July 10, 1998, it was not clearly established in this (or any other)
> circuit that simply handcuffing a person and detaining her in handcuffs during a search for
> evidence would violate her Fourth Amendment rights. . . . Our decision today makes it clear
> that such conduct, absent justifiable circumstances, will result in a Fourth Amendment
> violation.

342 F.3d at 1063.

The Equal Protection case law is equally long-standing, with Supreme Court and Ninth

Circuit precedent going back to the 1970s.

Defendant is not entitled to qualified immunity.

**CONCLUSION**

Based on this brief and the exhibits presented to the Court, Plaintiff respectfully requests

that the Court deny summary judgment to Defendant.

Respectfully submitted February 17, 2026.

    /s/  Marianne Dugan
Marianne Dugan, OSB # 932563
mdugan@cldc.org
CIVIL LIBERTIES DEFENSE CENTER
1711 Willamette Street Ste 301 # 359
Eugene, OR  97402
541-687-9180

On the Brief: Third Year University of Oregon Law Student Emily Cole