Daniel Miller

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


ADAM GILLIAM,                    ) No. 6:25-cv-00492-MTK

                Plaintiff,       )

    v.                           )

DANIEL C. MILLER,                )

                Defendant.       )


DEPOSITION OF DANIEL MILLER

October 23, 2025

Thursday

1:07 PM


        THE VIDEO-RECORDED DEPOSITION OF DANIEL

MILLER was taken at CC Court Reporting &

Videoconferencing, 440 East Broadway, Suite 160,

Eugene, Oregon, before Sara Fahey Wilson, CSR/CCR,

Certified Shorthand Reporter in and for the State of

Oregon and Washington.

EXHIBIT B

1    I'm wrong.

2         A.    I guess.  I don't know how they are

3    entered into a database.  We scan these copies and

4    upload them to a computer, and once it's gone from

5    there I don't know.

6    BY MS. DUGAN:

7         Q.    Okay.

8              Actually, I'm going to back up and talk

9    about Mr. Gayles for a minute.  So in your report

10   about the incident with Mr. Gilliam -- actually, on

11   page -- well, it's the third page down but it's page

12   2 of the Incident/Custody Report -- I think on the

13   bottom it says Plaintiff 0003.

14        A.    Yes, ma'am.

15        Q.    Okay.

16              At the very bottom you say (as read):

17        I determined Simon Gayles resides at the

18        residence.  I knew -- I know Simon Gayles

19        from several police contacts.  It's been

20        reported that Simon Gayles has been using

21        illegal narcotics and is often in trouble

22        with suppliers due to lack of payment.

23              So first of all, let's talk about what

24   were the several police contacts that you recalled

25   at that time?

EXHIBIT B

1        A.    One of my very first cases I worked in the

2    city of Coburg, Simon came to the police department

3    with injuries to his nose that was bitten by a

4    girlfriend, so he was the victim of an assault.

5              Other ones would be mostly contacting him

6    to try to get ahold of his younger brother, Dillon

7    (phonetic).

8              He was also called in as a subject from a

9    Department of Human Services Child Welfare referral.

10   And I never actually did contact him.  I wasn't able

11   to find him as a result of that one.

12       Q.    Okay.

13             Was that the contact -- the DHS issue, was

14   that the contact where you learned that Simon

15   allegedly owed people money for drugs?

16       A.    Yes.

17       Q.    Okay.

18             Had you ever interviewed Simon Gayles

19   previous to this Mr. Gilliam incident?  Taken a

20   statement from him on anything?

21       A.    I have.

22       Q.    Had you found him to be reliable?

23       A.    Yes.

24       Q.    Okay.

25             And tell me about that.  Why was he

EXHIBIT B

1    reliable?

2        A.    He had injuries consistent with his

3    statement.

4        Q.    The nose?

5        A.    That's correct.

6        Q.    Okay.

7        A.    And witness statements corroborated that

8    as well.

9        Q.    Okay.

10            So other than that incident where he was

11    the victim of having his nose bitten, was there any

12    other time you took a statement from him?

13       A.    Not from him.

14       Q.    Okay.

15            All right.  Going back to Exhibit 4, on

16    page -- at the bottom it's 0004 -- the second

17    paragraph you say (as read):  Due to the

18        emergent nature of the call, I pulled my

19        vehicle approximately one half block closer

20        and deployed my long rifle.

21            So due to the emergent -- was one reason

22    you deployed your long rifle because of the emergent

23    nature of the call?

24       A.    It was a report of an armed burglary so,

25    yes, ma'am.

EXHIBIT B

Daniel Miller

1    Q.    So when you say "emergent," did you mean

2    emergency?  Or what do you mean by "emergent"?

3    A.    Yes, ma'am.

4    Q.    Okay.

5          So the long rifle -- tell me -- because

6    I'm not -- I'm not in your shoes -- why would you

7    use the long rifle instead of a gun?

8    A.    It gives me an advantage as far as fire

9    power, generally speaking.  It gives me an advantage

10   as far as distance.  I could engage a target at a

11   longer distance and still be able to observe the

12   entire surroundings.  It gives me a more accurate

13   platform should I need to use it.  It's tactically

14   advantageous.

15   Q.    Okay.

16         Later in that paragraph you say

17   (as read):  Responding cover units were

18   already en route.

19         Do you recall how many officers eventually

20   arrived on scene?

21   A.    A lot.

22   Q.    A lot?

23   A.    I don't have a number for you.

24   Q.    Okay.

25   A.    I never did take a tally or anything.  I

EXHIBIT B

1    honestly have no idea who all was there.

2          Q.    Okay.

3                Do you know if any of them other than

4    Trimboli wrote a report?

5          A.    I don't know.

6          Q.    Okay.

7                All right.  So you had Mr. Gilliam face

8    away from you, go down on his knees, while placing

9    his hands over his head, and he complied?

10         A.    Yes, ma'am.

11         Q.    Okay.

12               And as you know, all of this was on your

13   body cam?

14         A.    That's correct.

15         Q.    And upon the arrival of the first cover

16   unit, Lane County Deputy Trimboli, he -- Trimboli,  I

17   guess -- advanced to the passenger side of my

18   vehicle and drew his handgun --

19                    THE REPORTER:  I'm sorry.  Passenger

20   side of the vehicle . . .

21   BY MS. DUGAN:

22         Q.    Sorry.

23               -- and drew his handgun?

24         A.    Yes, ma'am.

25         Q.    Okay.

EXHIBIT B

Daniel Miller

34

```
1            (As read):  We continued to hold the
2       subject at gunpoint until the arrival of a
3       third officer.
4            And you don't recall who that was?
5       A.   I could tell you it was an unmarked state
6    police vehicle.
7       Q.   Okay.
8            And you don't remember the name of the
9    officer?
10      A.   I don't know who it was.
11      Q.   Okay.  All right.
12           (As read):  And upon the arrival of the
13      third officer, Deputy Trimboli and I walked
14      forward.  Once we were approximately 50 feet
15      from the subject I had him stand to his feet
16      and walk backwards to the sound of my voice
17      and he complied.
18           Correct?
19      A.   Yes, he did.
20      Q.   (As read):  And once we were
21      approximately 50 feet -- sorry.  When he was
22      approximately 25 feet away from us I had him
23      lift his shirt from the back of his
24      shoulders, exposing his waistline, to ensure
25      there were no visible weapons.
```

EXHIBIT B

```
1              Okay.
2              And throughout you're explaining the
3       directions you gave, and he complied with every
4       direction.  Correct?
5          A.    He did.  Yes, ma'am.
6          Q.    Okay.
7              All right.  (As read):  Cover officers
8          moved up and detained the subject.
9              You don't know remember who those were?
10         A.    I don't.
11         Q.    Okay.
12             (As read):  A cursory search of the
13         subject yielded no weapons or means of escape.
14             So when you say "cursory," what does that
15      mean?
16         A.    An exterior pat-down for weapons or means
17      of escape.
18         Q.    Okay.
19             And you viewed that search, that pat-down?
20         A.    I did not.  That occurred behind me.
21         Q.    Okay.
22             But did one of the officers tell you --
23         A.    They told me he was clear.
24         Q.    Clear?
25                 MR. MURDOCK:  You got to wait until
```

EXHIBIT B

Daniel Miller

1    she's done.

2                    THE WITNESS:  I apologize.

3                    MS. DUGAN:  It's okay.  We all do it.

4    BY MS. DUGAN:

5        Q.    At no time did you see a weapon on

6    Mr. Gilliam.  Correct?

7        A.    I'm sorry.  Can you say that --

8        Q.    You never saw a weapon on Mr. Gilliam?

9        A.    I did not, no.

10       Q.    Okay.

11             You never learned that there was a weapon

12   on him?

13       A.    No.

14       Q.    And somebody searched his vehicle as well.

15   Correct?

16       A.    Yes.  I can testify that we looked through

17   the exterior windows, but as far as knowledge of

18   going through the vehicle, I have no knowledge of

19   that.

20       Q.    Okay.

21       A.    I'm not saying it didn't happen.  I'm

22   saying I don't re -- I wasn't there present.  I

23   didn't do it.  So I don't know.

24       Q.    Okay.

25             And you don't recall any officers saying

EXHIBIT B

1    there's no weapons in his vehicle?

2         A.    I remember officers saying that it was

3    clear from the outside.

4         Q.    Okay.

5         A.    Yes, that's safe to say.

6         Q.    Okay.

7              So in the next paragraph in the middle --

8    about the middle (as read):  As we passed

9         the black object laying on the ground I could

10        see it was a black-in-color wallet.

11             So that was the item that Mr. Gilliam had

12   had in his hand?

13        A.    That's what I was able to deduce from the

14   situation.

15        Q.    Okay.

16             The next sentence says (as read):

17        Gayles complied.

18        A.    I'm sorry.  I lost you.

19        Q.    Yeah, so let's back up.  "Gayles

20   complied."  (As read):  So as we passed the

21        black object laying on the ground I could see

22        it was a black-in-color wallet.

23             Do you see that sentence?

24        A.    Yes, ma'am.

25        Q.    Then it says (as read):  Gayles

EXHIBIT B

1       complied and he was detained.

2               Let me back up.  So at one point -- at

3       what point did -- or who took Mr. Gilliam to a

4       vehicle -- a police vehicle?

5       A.    It would have been a deputy or a trooper.

6       I don't have knowledge of that.  That happened while

7       I was up above in front of everyone.

8       Q.    Okay.

9               Were any of these cover officers taking

10      orders from you in any way?

11      A.    No.

12      Q.    Okay.

13      A.    Well, can you say that better --

14      Q.    I can say it better.

15      A.    -- I guess?

16      Q.    Usually I could say things better.

17              As far as the decision-making about what

18      to do with Mr. Gilliam, were there other officers

19      looking to you for direction about that?

20      A.    They were never -- I never was consulted

21      about it.

22      Q.    Okay.

23      A.    I -- we train for these things so we are

24      all on the same page.  That's what generally

25      happens, is when somebody is detained, they are

EXHIBIT B

```
1    taken to the most rearward part too keep them safe
2    and to keep us safe and they are usually placed in a
3    vehicle which frees up the officer -- or the other
4    officer and is able to keep them contained, or from
5    leaving, or from doing anything else, yeah.
6         Q.    And the vehicle is locked so that person
7    can't get out?
8         A.    Yes.  And -- yes.
9         Q.    Okay.
10             They can't get from the back into the
11   front uneven if they were unhandcuffed?
12        A.    Our vehicles you cannot because there's a
13   partition.
14        Q.    Okay.
15             So the vehicle he was in . . .
16        A.    I think it had a partition in it, but I'm
17   not sure.
18        Q.    Okay.
19             At some point -- at some point there was a
20   phase where there was an investigation going on.
21   Correct?
22        A.    Oh, yeah.
23        Q.    And were you the person -- the officer
24   doing the investigation?
25        A.    Yes.
```

EXHIBIT B

1      Q.    Okay.

2            That middle paragraph, the final sentence

3      (As read):  Upon the suspect's arrival, Gayles

4      told me he threatened his life -- meaning

5      Mr. Gilliam -- and made affirtive [sic]

6      movements.

7            What did you mean by "affirtive"?

8      A.    Quick moving movements to his pockets.  I

9  believe without -- I mean, I don't -- I think that's

10  what Simon actually said.

11     Q.    Oh, he said the word?

12     A.    I believe that's what he -- if my memory

13  serves me correctly.

14     Q.    Had you heard that word before?

15     A.    It's a common term we use.

16     Q.    Okay.

17           Could you mean "furtive," F-U-R-T-I-V-E?

18     A.    That's what I took it as.

19     Q.    In the next paragraph you say (as read):

20     I asked dispatch to notify my supervisor,

21     Sergeant Lee, due to the high volume of law

22     enforcement in the area so he would be aware

23     of any questions the citizenry may have.

24           Can you explain what you mean by -- what

25  was the purpose of the call to your supervisor?

EXHIBIT B

1     A.    Absolutely.  So any -- the city of Coburg,

2    generally speaking, is very quiet.  This is

3    something that they are -- the citizenry is not

4    accustomed to, so I knew that there would be calls

5    to Mayoral staff, city administrators, and to

6    mitigate that I thought it would be best to notify

7    my supervisor of what was occurring.

8         Q.    In the next paragraph you say

9         (as read):  Sergeant Lee --

10             Sorry.  Two paragraphs down -- because now

11    Sergeant Lee arrives on the scene (as read):

12        Sergeant Lee and I escorted Simon Gayles back

13        to my patrol vehicle to obtain his statement.

14             So at this point you're doing an

15    investigation of Mr. Gayles' allegations?

16        A.    Yes, ma'am.

17        Q.    Okay.

18             So on the next page, which at the bottom

19    says 0005, that first full paragraph (as read):  At

20        this time I went back to my patrol vehicle

21        to speak with the suspect, Gilliam.

22             So was he in your patrol vehicle?

23        A.    No.  But the patrol car he was in had been

24    moved up close to mine.

25        Q.    Okay.

EXHIBIT B

```
1              So at this point you're still kind of --
2       you're in investigative mode?
3          A.   Yes, ma'am.
4          Q.   Okay.
5              In the next paragraph he kind of gives his
6       side of the story.
7              In the next paragraph (as read):  At
8         this time I advised Gilliam of his Miranda
9         rights.
10             Why did you do that?
11         A.   Because he was a suspect in a crime that I
12      was investigating.  I was asking him accusatory
13      questions.
14         Q.   Okay.
15         A.   And he was in custody.
16         Q.   He was in custody?  Okay.  So he wasn't
17      under arrest yet?
18         A.   No, ma'am.
19         Q.   And you never Mirandized Mr. Gayles.
20      Correct?
21         A.   I'm sorry?
22         Q.   You never Mirandized Mr. Gayles?
23         A.   No, ma'am.
24         Q.   Why not?
25         A.   He wasn't a suspect.
```

EXHIBIT B

Daniel Miller

```
 1        Q.    At no point?

 2        A.    No, ma'am.

 3        Q.    Until you wrote your report and referred

 4   it out?

 5        A.    Well, Mr. Gilliam asked me to do that, and

 6   I would agree that, you know, maybe there's some

 7   merit there.

 8        Q.    Okay.  Okay.

 9              So then a repo guy shows up.  Correct?

10        A.    Yes, ma'am.

11        Q.    Somebody should write a movie script.

12        A.    He can't make this stuff up, no.

13        Q.    He can't make this stuff up.  Okay.

14              The next paragraph (as read):  I had

15     Gilliam sit back in the patrol vehicle.

16              So when you were interviewing him was

17   he -- you say you had him step out of the car, so he

18   was outside of the vehicle while you interviewed

19   him?

20        A.    I don't recall.

21        Q.    Okay.

22              Then you had him sit back in the patrol

23   vehicle.  He was still cuffed but now he had the

24   double cuffs on?

25        A.    I know that I placed him in double cuffs.
```

EXHIBIT B

```
 1   I just don't recall the sequence of events.

 2        Q.   He wasn't uncuffed when you left him in --

 3        A.   No, ma'am.

 4        Q.   Okay.

 5             THE WITNESS:  My apologies.

 6             THE REPORTER:  Yeah, if you guys could

 7   stop talking over each that would be great.

 8   BY MS. DUGAN:

 9        Q.   Okay.  All right.

10             So then you interviewed the neighbor,

11   David Straub?

12        A.   Yes, ma'am.

13        Q.   And then the female person who was

14   videoing interacted with you?

15        A.   Yes.

16        Q.   And then you tried to contact Mr. Gayles'

17   mom?

18        A.   Yes.  I was trying to contact anybody

19   inside of that house.

20        Q.   Okay.

21             Then you spoke with the female subject who

22   was filming and provided her with your business

23   card, struck up a conversation with her to calm her

24   down.

25             Why did you strike up a conversation?  Why
```

EXHIBIT B

1   did you need to calm her down?

2       A.    Well, there was several reasons for that.

3   Community caretaking for one.  Two, she might have

4   been a witness.  Three, she was borderline

5   interfering, and I thought it would be easier and

6   faster to have that conversation with her than to

7   have to arrest her as well.

8       Q.    Okay.

9             So you thought she might be a witness, but

10  on body cam I don't believe you asked her if she

11  observed anything.

12      A.    That is actually a technique.  Sometimes

13  it's best just to let people talk and they'll tell

14  if they observed anything without actually telling

15  you they observed anything.

16      Q.    Okay.

17            But you didn't outright just say, "Did you

18  see anything?"

19      A.    No.

20      Q.    Okay.

21            In the next paragraph (as read):  I

22      advised Sergeant Lee of my findings, and we

23      determined we no longer had probable cause

24      for the arrest of Gilliam.

25            What were your findings that you recall

EXHIBIT B

1   telling him?

2       A.    I don't recall.  We spoke back-and-forth

3   about my findings.  I recall saying that I no longer

4   had probable cause for his arrest.

5       Q.    Okay.

6             So then the next page -- the final page

7       (As read):  Action Recommended: Forward to

8       city prosecutor for review of possible

9       Initiating of a False Report.

10            You said that was at the request of

11  Mr. Gilliam.  When did he ask you to do that?

12      A.    After our contact was essentially done and

13  I was walking with him back to his vehicle he says,

14  "What about -- what about Simon?  Well, what about

15  finishing [sic] a false police report?"

16            I was considering that, and I thought,

17  well, that might have merit, so I thought I would

18  send it to the prosecutor to see if they agreed or

19  not.

20      Q.    Okay.

21            And did the prosecutor get back to you?

22      A.    They did not.

23      Q.    Did you ever email or call the prosecutor

24  to follow up?

25      A.    No, ma'am.  I had forgotten I -- I mean,

EXHIBIT B

1    we are -- with one person on at a time we are

2    inundated with calls.  It's -- once this left my

3    desk I didn't even think about it again until

4    Mr. Gilliam made his request.

5        Q.    So as far as you know there's no

6    documentation of this being forwarded to the city

7    prosecutor.  Is that correct?

8            MR. MURDOCK:  Object to the form.

9    Same objection.

10   BY MS. DUGAN:

11       Q.    Is it correct?

12       A.    I'm sorry.  Say that again.

13       Q.    To your knowledge there's no documentation

14   you're aware of that this was actually forwarded to

15   the city prosecutor?

16       A.    Oh, I have no idea.

17       Q.    Let's see.  What is your understanding of

18   why so many officers came to the scene?  Is that

19   just a common response in certain situations?

20       A.    Yes, ma'am.  Anytime that there's a threat

21   of a gun involved, we're -- or something similar --

22   it would -- it would have a large police response.

23       Q.    Okay.

24            All right.  Let's see.  This is --

25            THE WITNESS:  Thank you.

EXHIBIT B

```
 1                    (Deposition Exhibit 6

 2                 marked for identification.)

 3    BY MS. DUGAN:

 4        Q.    I'm showing you what's marked as Exhibit

 5    6.  I guess this is the dispatch call -- the record

 6    of the dispatch from the Sheriff's Office.

 7              So it's talking about who we now know as

 8    Mr. Gayles whispering that there's a male there with

 9    a gun.

10              So the fifth thing down I think is

11    probably unrelated.  It says (as read):

12        Most recent location history following up

13        on OCA Waker Point homicide?

14        A.    I couldn't tell you.

15        Q.    Okay.

16              Something unrelated, I'm guessing?

17        A.    Right.

18        Q.    Okay.

19              Down -- the time stamp is 16:49:30, it

20    starts with the number 864.  Is that your badge

21    number?

22        A.    Yes, ma'am.

23        Q.    Okay.

24        A.    Where are you looking?  I'm sorry.

25        Q.    So there's the time stamps -- the time
```

EXHIBIT B

1    numbers --

2         A.    Oh, yes.

3         Q.    -- is probably the easiest way to find it.

4    16:49:30.

5         A.    Okay.

6         Q.    (As read):  864 challenging one with

7         LR about 100 yards.

8              Is that long rifle?

9         A.    Yes, ma'am.

10        Q.    Okay.

11             Next page, the time is 16:57:35, do you

12   see that?

13        A.    Yes, ma'am.

14        Q.    (As read):  C/POSS SAID 32130.

15             Do you know what that means?

16        A.    Can you say that again?  I'm sorry.

17        Q.    That line says (as read):  C, slash,

18        POSS.

19             Do you see that?

20        A.    At sixteen five --

21        Q.    16:57:35, I think, unless the time is

22   below the words.  I don't know.  I can show you.

23        A.    Oh, A343?  Is that what you're saying?

24        Q.    Right below that.  (As read):  C,

25        slash, POSS?

EXHIBIT B

```
1          A.    Oh.  Possibly said.

2          Q.    Possibly -- okay -- said.  32130, do you

3     know what that is?  Is that an address?

4          A.    It might be.

5          Q.    Okay.  All right.

6                Middle of the page, sort of, 17:01:33,

7     right below that time stamp number (as read):

8        C asking if a BM is in custody.

9                What does that mean?

10         A.    It says complainant asking if the Black --

11    if a Black male is in custody.  I'm guessing.

12         Q.    Right.  Right.  Okay.

13               Two down from that, "Gayles, Simon Clark,"

14    some other number -- you know, some information --

15    says "prior arrest, Assault 4.

16               Is that his prior criminal record?

17         A.    I wouldn't know.  I'm guessing that's

18    something that dispatch would put in.

19         Q.    Okay.  Okay.  Okay.  All right.

20               So I wanted to go through -- back

21    through -- a little bit through the chronology of

22    what happened.

23               Okay, so when you first got the dispatch

24    call or heard it, just so I understand, did you say

25    --
```

EXHIBIT B

1    were -- was it directed at you or did you tell

2    them -- tell dispatch that you would respond?

3         A.    No.   It was my call.   It was -- they would

4    say 864, which is my call sign, and then a call.

5         Q.    Because you're in Coburg, you're the only

6    officer?

7         A.    That's correct.   That's correct.   Yes,

8    ma'am.

9         Q.    Okay.

10              So when you heard the details of the

11   call -- and just so I understand, this exhibit we

12   just looked at, it's all just kind of shorthand but

13   there's also radio traffic, correct, that's a little

14   more detailed?   Like the words on the radio aren't

15   all getting written down here?

16        A.    Right.

17        Q.    Okay.

18              So when you first got the call do you --

19   did you believe you had reasonable suspicion of a

20   crime in progress?

21        A.    Reasonable suspicion -- when I got the

22   call?

23        Q.    Yeah.

24        A.    Yeah, based on what was relayed to me.

25        Q.    Right.

EXHIBIT B

1              And then did you -- did you think you had

2      probable cause of a crime that was underway as

3      different from reasonable suspicion?

4          A.    Yes.

5          Q.    Okay.

6              And when you learned that Mr. Gayles was

7      the caller that didn't change that analysis.

8      Correct?

9          A.    No.

10         Q.    Okay.

11             After Mr. Gilliam was handcuffed and

12     patted down did that change your analysis as to

13     whether there was reasonable suspicion of the crime

14     involving the alleged gun or probable cause?

15                 MR. MURDOCK:   Object to the form.

16     BY MS. DUGAN:

17         Q.    You can still answer.

18         A.    No, it doesn't change anything at that

19     point.  It just didn't -- he just didn't have a gun

20     on him.

21         Q.    Okay.

22             So tell me -- when you got the call and

23     you're headed there, what possible crimes are you

24     thinking of in your head?

25         A.    There could be a slew of crimes.

EXHIBIT B

Daniel Miller

53

1    Q.    Sure.  Menacing?

2    A.    Yeah, Menacing.  You have potential

3    Unlawful Use of a Weapon.  Disorderly Conduct.

4    Harassment.  Robbery.  A Burglary.  I mean, it could

5    go anywhere.

6    Q.    Okay.

7          So after you learned that there were no

8    guns on Mr. Gilliam did that eliminate any of the --

9    probable cause for any of those crimes?

10   A.    After no guns were found on him?

11   Q.    Uh-huh.  Yeah.

12   A.    I would say it would start to diminish

13   Unlawful Use of a Weapon but not -- it's definitely

14   not ruled out.

15   Q.    Okay.

16         And then when you saw that the item that

17   had been in his hand was a wallet, did that change

18   the analysis at all on any of those crimes?

19   A.    You mean once we moved up further?

20   Q.    Yeah.  After he was cuffed, taken away,

21   and then you walked by the wallet and saw --

22   A.    I would say that would help also to

23   diminish the Unlawful Use of a Weapon.

24   Q.    Okay.

25         So Mr. Gilliam is in the car cuffed.  Then

EXHIBIT B

Daniel Miller

1    you're talking to Mr. Gayles.  You cuffed him.  Then

2    you uncuffed him.  Why did you cuff him and then

3    uncuff him?

4         A.    Because he wasn't a subject of a complaint

5    of a crime at that point.

6         Q.    Why did you cuff him to start with?

7         A.    I never cuffed him.  I believe another

8    deputy did.

9         Q.    Oh, okay.

10        A.    But that was done to keep everyone safe.

11   We didn't know who has guns or anything else.  And I

12   do know Simon to have guns in the past.

13        Q.    Okay.

14              Then after you talked with Mr. Gayles I

15   presume that did not, in your mind, get rid of or

16   reduce any probable cause for any of those -- well,

17   let's talk about Robbery and Burglary.  Were those

18   still on the table at that point?

19              THE VIDEOGRAPHER:  You keep rubbing

20   your mic.

21              MS. DUGAN:  Oh.  Sorry.

22              MR. MURDOCK:  Your jacket is up

23   against it.  There we go.

24              MS. DUGAN:  Did that all get clear, do

25   you think?

EXHIBIT B

1    BY MS. DUGAN:

2        Q.    Okay.  All right.  Let me back up.

3              So at any point did you kind of eliminate

4    Robbery and Burglary from your list of potential

5    crimes?

6        A.    Yes.

7        Q.    And when did those kind of drop off?

8        A.    Once I was able to talk to Simon and found

9    that he had not retained property from Simon.

10       Q.    Okay.

11       A.    Or obtained property from Simon.

12       Q.    Okay.

13             And did your discussion with Simon

14   change -- reduce the probable cause for the Menacing

15   or the Disorderly or Harassment?

16       A.    No.

17       Q.    Okay.

18             Was Unlawful Use of a Weapon still in your

19   mind still as a probable cause?

20       A.    I don't know that it would be a probable

21   cause at this point as no search had turned up a

22   weapon.

23       Q.    Okay.

24             So you said "I don't know," but --

25       A.    I'm sorry?

EXHIBIT B

1      Q.    Okay.

2            So what you just said, I think, was, I

3      don't know that there would be probable cause on the

4      weapons charge?  Or was there?  Or was there not?

5      A.    No.  I mean, that -- I would -- I was

6      starting to think that maybe not for the weapon

7      charge.

8      Q.    Well -- so Unlawful Use of a Weapon would

9      not depend on what Simon thought Mr. Gilliam had; it

10     would actually require that Mr. Gilliam had a

11     weapon?

12     A.    Correct.  Right.  Yes.

13     Q.    So you said, "I was starting to think

14     maybe not," but you had determined there was no

15     weapon on Mr. Gilliam at the time.  Correct?

16     A.    Yeah, he did not have a weapon on him at

17     the time.

18     Q.    So there wouldn't be any probable cause

19     for a weapons charge.  Correct?

20               MR. MURDOCK:  Object.

21               THE REPORTER:  I'm sorry.  I didn't

22     hear that.

23               MR. MURDOCK:  Object to form.

24     BY MS. DUGAN:

25     Q.    You can answer.

EXHIBIT B

1        A.    That's not true.

2        Q.    Okay.

3        A.    He could have tossed a weapon.  He could

4   have hid a weapon.  Just because he doesn't have it

5   on him doesn't mean that didn't occur.

6              MR. MURDOCK:  Sorry.  Just for

7   clarity, when you're saying "at the time," I wasn't

8   sure if you're talking about at the time of their

9   interaction or their interaction.

10  BY MS. DUGAN:

11       Q.    After you saw the item on the ground was a

12  wallet is the timing.

13       A.    I understand what you're saying.

14       Q.    Yeah.  Yeah.

15             So did one of the officers go look to see

16  if there was a weapon tossed or hidden somewhere?

17       A.    More than one.

18       Q.    Okay.

19             When did that investigation conclude?

20       A.    I don't know that it ever really concluded

21  until -- you know, we were all looking around the

22  entire time we were there just in case.

23       Q.    Okay.

24             And then after you took Mr. Gilliam's

25  story -- statement -- did that change your probable

EXHIBIT B

1    cause analysis on any charges -- potential charges?

2        A.    No.

3        Q.    Okay.  Okay.

4              I presume when the repo man showed up that

5    didn't change any of your analysis?

6        A.    No.

7        Q.    Okay.

8              After you talked with the neighbor,

9    Mr. Straub, did that affect your analysis of

10   probable cause regarding any of the potential

11   crimes?

12       A.    It affected my probable cause for Robbery

13   and Burglary and actually bolstered Menacing.

14       Q.    Bolstered Menacing?  Okay.  Because --

15       A.    And disorderly conduct.  I apologize.

16       Q.    Okay.

17             So let's talk about -- so Robbery and

18   Burglary, I think you said you had already kind

19   of --

20       A.    Yeah.

21       Q.    -- dismissed in your brain?  Okay.

22             Why did the discussion with Mr. Straub

23   bolster the Menacing or Disorderly probable cause?

24       A.    Mr. Straub told me that he had heard an

25   argument outside of his house.  He went to go

EXHIBIT B

1    investigate it and saw Simon and Mr. Gilliam engaged

2    in an argument and saw Simon go into the -- I don't

3    recall if he said Simon had gone to the house or if

4    Simon was already in the house, but I do recall him

5    saying that Mr. Gilliam was walking around outside

6    trying to, essentially, keep him there.  And then

7    when Simon came out of the house he said that he

8    heard -- quote, unquote, said Simon screamed like a

9    girl and took off running.

10         Q.    So Simon's behavior as reported by the

11    neighbor bolstered Menacing and Disorderly?

12         A.    Uh-huh.

13         Q.    Yes?

14         A.    Yes.

15              MR. MURDOCK:  Yes?

16              THE WITNESS:  I'm sorry.

17    BY MS. DUGAN:

18         Q.    That's okay.

19              All right.  So at some point on the body

20    cam you say to your sergeant -- sorry.  Was he a

21    sergeant?

22         A.    He was.  Yes, ma'am.

23         Q.    -- "I don't think I have probable cause."

24    Correct?

25         A.    That's correct.

EXHIBIT B

1    Q.    For anything?  I mean, you guys didn't

2    discuss Harassment or Disorderly?

3    A.    So I believe that the probable cause still

4    existed for Disorderly Conduct.  We chose -- we

5    choose not to prosecute low level crimes like this.

6    It's just not feasible, really, and were not

7    applicable sometimes.  Just because we have a crime

8    or probable cause for a crime doesn't mean we have

9    to enforce it unless it's a Measure 11 or an APA.

10    Q.    APA?  Sorry.

11    A.    Assault Prevention Act.  I'm sorry.

12    Q.    Oh, the -- like domestic violence?

13    A.    Yes.  That's correct.

14    Q.    Right.  Right.

15          But on your body cam you said to your

16    sergeant, "I don't know I have probable cause for

17    shit right now."  Correct?

18    A.    Yeah, I said that.

19    Q.    Okay.

20          And he said, "I don't think you do

21    either."

22          None of you -- neither of you discussed

23    what you just told me about Disorderly and

24    Harassment.  Correct?

25    A.    Not at that time.

EXHIBIT B

1    Q.    Later?

2    A.    Yes, later.

3    Q.    When?

4    A.    I don't recall if we were still at the

5    scene, or if we had already left, or it might have

6    been even when we were back at the police

7    department.  I just don't recall.

8    Q.    Okay.

9          So once you determined he did not have a

10    weapon on him why did you keep him cuffed in the

11    locked police car?

12    A.    I was not back with him.  I was -- left

13    him in the custody of another officer -- or a

14    deputy.

15    Q.    And you didn't have a discussion with that

16    deputy about whether he should be cuffed or not

17    cuffed?

18    A.    He's still a suspect.

19    Q.    Well, was this an investigative detention

20    or an arrest?

21    A.    It was investigative.

22    Q.    Okay.

23          And he wasn't -- at that point there was

24    nothing making him unsafe -- you know, a safety risk

25    for officers or others or a flight risk.  Correct?

EXHIBIT B

```
1                    MR. MURDOCK:  Object to the form.

2        A.    I have no idea.  I wasn't back there with

3    him.

4    BY MS. DUGAN:

5        Q.    And then when you went back there and

6    interviewed him you did put on an extra cuff?

7        A.    Yes.

8        Q.    But you kept him cuffed?

9        A.    Yes.

10       Q.    Okay.

11             So when you were with him then and put him

12   back in the car in cuffs he did not present a safety

13   risk for officers or others or a flight risk.

14   Correct?

15                  MR. MURDOCK:  Object to the form.

16   BY MS. DUGAN:

17       Q.    You can answer.

18       A.    No, because he was detained.

19       Q.    For an investigative detention, not

20   arrest?

21       A.    Right.  He wasn't under arrest.

22       Q.    Okay.

23                  MS. DUGAN:  I have no further

24   questions.

25                  MR. MURDOCK:  All right.  That's it.
```

EXHIBIT B

Daniel Miller

63

```
 1                    THE VIDEOGRAPHER:   Okay.   We'll go off

 2       the record.   Our time is 2:16.

 3                    (The deposition was adjourned

 4                 at 2:16 p.m.)

 5                        --o0o--

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT B

```
 1    State of Oregon    )
                         )        ss.
 2    County of Lane     )

 3

 4        I, Sara Fahey Wilson, CSR, a Certified Shorthand

 5    Reporter for the State of Oregon, certify that the

 6    witness was sworn and the transcript is a true

 7    record of the testimony given by the witness; that

 8    at said time and place I reported all testimony and

 9    other oral proceedings had and foregoing matter;

10    that the foregoing transcript consisting of 63 pages

11    contains a full, true and correct transcript of said

12    proceedings reported by me to the best of my ability

13    on said date.

14        If any of the parties or the witness requested

15    review of the transcript at the time of the

16    proceedings, such correction pages are attached.

17        IN WITNESS WHEREOF, I have set my hand this 6th

18    day of November 2025, and City of Eugene, County of

19    Lane, State of Oregon.

20

21

22

23    Sara Fahey Wilson, CSR

24    CSR No. 06-0400

25    Expiration Date:  March 31st, 2026
```

EXHIBIT B