IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

ADAM GILLIAM,                                             Case No. 6:25-cv-00492-AP

               Plaintiff,              **OPINION AND ORDER**

     v.

DANIEL C. MILLER,

               Defendant.

_____

POTTER, United States Magistrate Judge:

    Adam Gilliam (Plaintiff) filed this action against Sergeant Daniel Miller (Defendant) for alleged violations of his civil rights. Before the Court is Defendant's Motion for Summary Judgment. For the reasons explained below, Defendant's motion is denied as to Plaintiff's first claim and granted as to Plaintiff's second claim.

## BACKGROUND

    On March 25, 2023, Plaintiff drove to the home of a business associate, Simon Gayles (Gayles), to request the return of money paid for a construction job that Gayles failed to complete. Gayles called the police alleging Plaintiff had threatened him and chased him with a weapon. Compl. ¶ 15, ECF No. 1. Defendant arrived at the scene and immediately deployed his M4 rifle, ordering Plaintiff to kneel and walk backwards towards where Defendant was positioned. Compl. ¶ 16; Def.'s Mot. 3, ECF No. 14. Plaintiff complied with Defendant's orders; he was then searched for weapons, handcuffed, and placed in a patrol car while Defendant investigated Gayles' allegations against Plaintiff. Compl. ¶¶ 19-25; Def.'s Mot. 3.

PAGE 1 – OPINION AND ORDER

Gayles was already known to Defendant as someone with a "history of police encounters and using narcotics." Compl. ¶ 30. At the outset of the investigation Gayles was placed in handcuffs but he was uncuffed by Defendant after 19 minutes. Compl. ¶ 24. Defendant interviewed Gayles, who explained that he owed Plaintiff's girlfriend money for a construction job he failed to perform. Dugan Decl. ¶ 3, Ex. C (BODYCAM 1)[1] 5:22-5:27, ECF No. 18. Gayles asked if Plaintiff had a weapon, and Defendant answered no weapon was found. Dugan Decl. ¶ 3, Ex. C (BODYCAM 2)[2] 17:30, ECF No. 18.

Defendant's supervising sergeant arrived on scene and Defendant explained that they had found no weapons on Plaintiff. He stated that they "may have a menacing,"[3] but that he had not yet confirmed Plaintiff's identification. BODYCAM 2 17:37. No other possible crimes were discussed.

Defendant then moved to the police car where Plaintiff remained handcuffed. Plaintiff informed Defendant that his shoulders were in pain due to the handcuffs and Defendant offered to let Plaintiff step out of the car. At this point, Gayles began yelling and frantically gestured that he needed to leave to deal with a tow truck attempting to repossess his truck. BODYCAM 2 17:38. Defendant permitted Gayles to run off, explaining to his sergeant that "he's the victim" after which Gayles disappeared from the footage and, presumably, the investigation. BODYCAM 2 17:38.

---

[1] Video E11210_E11209_BCU_N38950_2023-03-25_234912000_658278276.

[2] Video E11211_E11209_BCU_N38950_2023-03-26_002912000_1251791077.

[3] "A person commits the crime of menacing if by word or conduct the person intentionally attempts to place another person in fear of imminent serious physical injury." ORS 163.190(1).

PAGE 2 – OPINION AND ORDER

After Gayles' departure, Defendant performed a pat-down search of Plaintiff. When Plaintiff stated that other officers had already performed a pat-down search, Defendant conveyed that the second search was necessary because he "did not want to get shot today." BODYCAM 2 17:39. Plaintiff then explained that he was there to ask for his girlfriend's money back, that he did not threaten Gayles, he did not have a weapon, and in fact he had not even raised his voice during his conversation with Gayles. BODYCAM 2 17:39-17:40. At that point, Defendant interrupted Plaintiff and read him his Miranda rights. BODYCAM 2 17:40. Plaintiff then continued to relay his side of the story. BODYCAM 2 17:40. After providing his version of events, Plaintiff repeated his request to have the handcuffs loosened, which Defendant declined to do. BODYCAM 2 17:43. Defendant instead fit Plaintiff with a second set of handcuffs to ease the pressure on his shoulders and locked him back in the police car. BODYCAM 2 17:43-17:45.

Shortly after leaving Plaintiff in the police car, Defendant discussed the encounter with his sergeant, noting that Plaintiff was "completely cooperative." BODYCAM 2 17:45. Defendant then interviewed the neighbor, David Straub (Straub), who corroborated Plaintiff's story that he was calm and did not threaten Gayles. BODYCAM 2 17:48. After concluding his interview with Straub, Defendant knocked twice on Gayles' door to speak with Gayles' mother, but she did not answer. BODYCAM 2 17:51.

Defendant then approached a woman filming the investigation and engaged her in conversation on topics unrelated to the dispute between Gayles and Plaintiff. BODYCAM 2 17:52-17:58. All told, Defendant spent a little over six minutes discussing various issues with the woman before shaking her hand and walking back towards the car where Plaintiff remained handcuffed. At that point, Defendant told his supervising sergeant "I don't know I have PC [probable cause] for shit right now." BODYCAM 2 17:59. Defendant's supervisor agreed, stating

PAGE 3 – OPINION AND ORDER

"I don't think you do either." BODYCAM 2 17:59. Three minutes later, Plaintiff was uncuffed and released. In total, Plaintiff was detained for 73 minutes; of that time, he was in handcuffs for approximately 62 minutes.

Plaintiff now brings claims under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments, including false arrest and unlawful detention. He also brings a claim against Defendant for violations of his right to equal protection on the basis race under § 1983 and the Fourteenth Amendment. Defendant moves for summary judgment on all claims.

## STANDARD OF REVIEW

Summary judgment is warranted when, based on the pleadings, depositions, and other interrogatories and admissions on file, together with the affidavits, if any, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A dispute is considered "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it could affect the outcome of the case; disputes about irrelevant or unnecessary facts do not preclude summary judgment. *Id.* And the materiality of the fact is "determined by the substantive law governing the claim." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Whether there is a genuine issue of material fact is often a close question. *Id.* Thus, the moving party bears an initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party cannot merely rely on allegations in the pleadings or claims that it will discredit the moving

PAGE 4 – OPINION AND ORDER

party's evidence at trial. *Id.* But neither party needs to prove any fact conclusively at this stage. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party and when evidence conflicts, the court "must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *Id.* at 631. At bottom, "if a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." *Id.*

## DISCUSSION

Defendant argues Plaintiff's first claim should fail because the detention was lawful. As to Plaintiff's second claim, Defendant argues there is no evidence in the record of intentional racial discrimination. Finally, Defendant argues that he is entitled to qualified immunity on both claims because his actions did not violate Plaintiff's clearly established constitutional rights.

### I.      Genuine Questions Exist as to Whether the Continued Detention Was Lawful

Defendant argues that Plaintiff's detention was justified given the "volatile situation" and that the detention amounted to an "investigative *Terry* stop to enable a safe and efficient inquiry." Def.'s Mot. 4, ECF No. 14. Defendant also argues that, even if the stop transitioned from a *Terry* stop into an arrest, probable cause existed making any such arrest lawful. Def.'s Mot. 4. Because there is a genuine dispute as to whether Plaintiff's continued detention while handcuffed was justified for the duration of the encounter, the Court finds that summary judgment is not appropriate at this stage.

### A.  *Defendant's Initial Detention of Plaintiff Was a Valid Terry Stop*

Under *Terry v. Ohio*, 392 U.S. 1 (1968), an officer may briefly detain an individual when that officer has reasonable suspicion supported by specific, articulable facts that criminal activity is or may be in the works. *See also United States v. Sokolow*, 490 U.S. 1, 7 (1989) (permissible

for police to "briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." (citation modified)). During a *Terry* stop, officers may "ask investigatory questions" but must carefully tailor the scope of the detention "'to its underlying justification.'" *United States v. In*, 124 F.4th 790, 794 (9th Cir. 2024) (quoting *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 937-38 (9th Cir. 2020)). The "investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion." *Florida v. Royer*, 460 U.S. 491, 500 (1983). To that end, a *Terry* stop generally "involves no more than a brief stop, interrogation and, under the proper circumstances, a brief check for weapons." *United States v. Robertson,* 833 F.2d 777, 780 (9th Cir.1987).

Here, Defendant had reasonable suspicion to stop, handcuff, and question Plaintiff based on Gayles' report of an armed person threatening him. According to the police report, when Defendant arrived in the area, Plaintiff was standing in the street outside Gayles' home, talking with Gayles' neighbor.[4] Defendant was looking out for an armed man; he saw something black in Plaintiff's hand and assumed that Plaintiff was the subject of the 911 call. After making that determination, Defendant held his weapon on Plaintiff until he was handcuffed.

Under the possible threat of an armed suspect, Defendant's initial response to the situation was reasonable. *See United States v. Miles*, 247 F.3d 1009, 1013 (9th Cir. 2001) (finding that, where police have "information that the suspect is currently armed" taking measures including "holding a suspect at gunpoint, requiring him to go to his knees or lie down on the ground, and/or handcuffing him will not amount to an arrest."). Moreover, "[p]olice

---

[4] The police report and testimony do not make clear how Defendant knew which of the two men standing outside Gayles' house was allegedly threatening Gayles.

PAGE 6 – OPINION AND ORDER

officers are entitled to employ reasonable methods to protect themselves and others in potentially dangerous situations." *Allen v. City of Los Angeles,* 66 F.3d 1052, 1056 (9th Cir.1995). Given the nature of the reported incident, Defendant's initial actions to secure the Plaintiff and the scene were within the bounds of a permissible *Terry* stop.

### B. *The Continued Detention Became a De Facto Arrest*

Plaintiff all but concedes that the encounter began as a permissible *Terry* stop. But he argues that early in the investigation, any semblance of an investigative *Terry* stop transitioned into a de facto arrest without requisite probable cause.

During an investigation, it may become clear that a *Terry* stop "can no longer be justified as an investigative stop," at which point the *Terry* stop "turns into an unconstitutional *de facto* arrest." *In*, 124 F.4th at 794 (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)); *see also United States v. Beltran*, 799 F. Supp. 3d 1102, 1117 (S.D. Cal. 2025) (noting that *Terry* stops are "an exception to the general rule requiring probable cause" and thus are necessarily narrow in scope).

"To determine whether a *Terry* stop becomes a *de facto* arrest," courts must "consider the totality of the circumstances, including the 'severity of the intrusion, the aggressiveness of the officer's actions, and the reasonableness of the officer's methods under the circumstances.'" *In*, 124 F.4th at 794-95 (quoting *Reynaga Hernandez*, 969 F.3d at 940); *see also Washington v. Lambert*, 98 F.3d 1181, 1188–89 (9th Cir. 1996)) (same). "No one factor is dispositive when evaluating the totality of the circumstances." *Allen v. City of Portland*, 73 F.3d 232, 235 (9th Cir. 1995); *see also United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir. 1990). Furthermore, in considering whether a person is subject to an arrest, as opposed to a detention, a court must "review the situation from the perspective of the person seized." *United States v. Delgadillo-*

PAGE 7 – OPINION AND ORDER

*Velasquez*, 856 F.2d 1292, 1295-96 (9th Cir. 1988). Under this standard, the test is whether "a reasonable innocent person in these circumstances would not have felt free to leave after brief questioning." *Id*.

Here, Plaintiff would certainly not have felt free to leave—he was handcuffed in the back of a police vehicle. Moreover, even after he was searched and questioned, Plaintiff was made to wait in handcuffs for the entire investigation, despite being found to have no weapons and Gayles having quite literally run away from the scene. This factor alone weighs heavily in favor of Plaintiff having been arrested as opposed to his having been merely detained.

As to the other factors, Plaintiff points to several key aspects of the detention as exceeding the scope of a *Terry* stop: (1) the length of the detention; (2) the intrusive nature of the detention; (3) the lack of risk to officers' safety; and (4) Defendant's admitted familiarity with complainant's dubious reputation. Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff was subjected to an unconstitutional, de facto arrest. *T.W. Elec. Serv. Inc.,* 809 F.2d at 631.

### 1.    The Length of the Detention

In considering "whether a detention is too long in duration to be justified as an investigative stop" a court should "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Sharpe*, 470 U.S. at 686. Defendant argues that the length of the detention was reasonable because, even after it was determined Plaintiff was unarmed, officer safety was still a concern.[5] Defendant argues that

---

[5] Defendant makes much of his theory that Plaintiff was at most detained for three to five minutes beyond what was reasonable. Whether and for what length of time the detention exceeded what was reasonably permissible under *Terry* is a question of fact and best suited for a jury's consideration.

"even assuming probable cause for a weapons offense dissipated early, the record shows continued investigation into the reported threatening conduct and prompt release once Sgt. Miller determined probable cause to arrest was lacking." Def.'s Repl. In Support of Mot. 3. Considering the facts, the Court concludes that there are genuine questions as to whether Sgt. Miller diligently pursued the investigation and did not subject Plaintiff to an overlong detention while he was handcuffed in the backseat of the patrol car. *Cf. McArthur v. City & Cnty. of San Francisco*, 190 F. Supp. 3d 895, 902 (N.D. Cal. 2016) (noting that the length of time that plaintiffs remained detained was particularly important because plaintiffs remained handcuffed).

Defendant provided inconsistent accounts of his grounds for continuing to detain Plaintiff. And his testimony provides little clarity as to when exactly Defendant's reasonable suspicion or probable cause existed and then abated. According to his testimony, Defendant had "reasonable suspicion of a crime in progress" when he first got the call from dispatch. Dugan Decl, Ex. B (Miller Depo.) 51:18-51:25, ECF No. 18. Defendant then testified that he had probable cause—rather than reasonable suspicion—that a crime was underway without clarifying what circumstances led to the escalation. Miller Depo. 52:01-52:04.

There is also a question about the nature of the offense that was being investigated. Defendant testified that at the outset of the investigation, based on the report from dispatch, he was considering "a slew of crimes" including menacing, unlawful use of a weapon, disorderly conduct, harassment, robbery and burglary. Miller Depo. 53:02-53:05. But early in the investigation he related to his supervisor that he only "may have a menacing." BODYCAM 2 17:37.

Defendant testified that he eliminated robbery and burglary from the list of potential crimes early on after learning from Gayles that Plaintiff had not retained any of Gayles' property.

PAGE 9 – OPINION AND ORDER

Miller Depo. 55:03-55:11; BODYCAM 2 17:22-17:35. As to concerns for weapons-related crimes, during his deposition Defendant testified that he did not know whether the investigation for a weapon "ever really concluded" stating "you know, we were all looking around the entire time we were there, just in case." Miller Depo. 57:15-57:22. But Defendant acknowledged that no weapons were in Plaintiff's car when state troopers concluded their search of Plaintiff's vehicle. BODYCAM 2 17:17. Defendant told other responding officers that "we don't even know if he was armed" noting that Plaintiff had been holding a wallet, rather than a gun. BODYCAM 2 17:19. Plaintiff's sweater, which had been lying on the ground, was searched and found to have no weapons in the pockets, only Plaintiff's phones. BODYCAM 2 17:20-17:21. Defendant told his supervisor that no weapons were found on Plaintiff or in his car.  BODYCAM 2 17:36.

That left only the possible claims of menacing and disorderly conduct, both of which are misdemeanors. At his deposition Defendant testified that probable cause for menacing and disorderly conduct was "bolstered" by his interview with Straub. Miller Depo. 58:12-59:12. But his next steps in the investigation do not comport with a bolstered concern for either menacing or disorderly conduct. Defendant's interview with Straub terminated around 17:50. BODYCAM 2 17:46-17:50. Defendant then knocked on Gayles' door, presumably to interview Gayles' stepmother but received no answer.

Next, instead of returning to Plaintiff—who remained handcuffed in the car—Defendant engaged a bystander who was filming the police activity in a friendly but unrelated conversation. Defendant did not ask the bystander any questions about the ongoing investigation. Defendant chatted with the bystander about First Amendment auditors, the public's right to record officers, and travel.

PAGE 10 – OPINION AND ORDER

In his deposition, Defendant characterized this interaction as community caretaking and stated that not asking questions was an interview technique. Miller Depo. 45:02-45:15. It is true that law enforcement is frequently called upon to perform "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 442 (1973). This is often linked to the police's responsibility to protect community safety. *Id.* at 447. But Defendant has not identified any safety concerns posed by the bystander. And, as for the interview technique, as Plaintiff points out, Defendant failed to ask the potential witness any questions related to the investigation during the entire interaction. Thus, viewed in the light most favorable to Plaintiff, this excursion added to the time that Plaintiff was detained and was not only unrelated to the investigation but unnecessary.

Of course, to the extent there was probable cause to arrest Plaintiff, the delay might not be of concern. But after Defendant concluded his conversation with the bystander, he informed his sergeant that he had no "[probable cause] for shit," and that his "intent is to cut [Plaintiff] loose." BODYCAM 2 17:59. Given that no investigation occurred between Defendant's conversation with Straub and Defendant's conversation with his sergeant, it is unclear how or when the recently elevated probable cause for menacing and disorderly conduct terminated.

There is a genuine dispute as to whether the detour to speak to the bystander was reasonable or unnecessarily prolonged the stop. This is the critical issue in any Fourth Amendment analysis. *Cf. Rodriguez v. United States*, 575 U.S. 348, 357-58 (2015) (noting that the question is whether the stop is prolonged past the time needed to complete the original mission). That it amounted to potentially only a few minutes does not change the analysis. *See Herrera-Amaya v. Arizona,* No. 14-CV-02278-TUC-RM, 2016 WL 7664134, at *8 (D. Ariz.

PAGE 11 – OPINION AND ORDER

Sept. 29, 2016), on reconsideration in part, No. 14-CV-02278-TUC-RM, 2018 WL 487835 (D. Ariz. Jan. 19, 2018) (finding unrelated questioning and dog sniff that took about six minutes prolonged the stop beyond when it should have been completed).

Plaintiff was handcuffed and detained for over an hour in the back of a police car; even a few additional minutes could—taken in the light most favorable to him—be unreasonable unless otherwise justified. No weapons were found on Plaintiff's person or in his car. By Defendant's own admission, he ultimately determined there was no probable cause for an arrest. On these facts, a reasonable jury could conclude that the detention was overlong, amounting to a de facto arrest without probable cause. *See Chinaryan v. City of Los Angeles*, 113 F.4th 888, 898 (9th Cir. 2024), *cert. denied sub nom. Cueto v. Chinaryan*, 145 S. Ct. 1927 (2025) (finding that detention for several additional minutes after plaintiffs were found to be cooperative and unarmed was unreasonable).

### 2. The Intrusive Nature of the Detention and Officer Safety

Courts must also "consider the intrusiveness of the tactics" employed by the police, as well as "the justification for those tactics" when determining whether a stop became an arrest. *McArthur*, 190 F. Supp. 3d at 902. There is no hard and fast rule as to under what circumstances more intrusive tactics are justified. *Id*. Rather, "the inquiry turns on 'whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken.'" *Id.* (quoting *Washington*, 98 F.3d at 1185).

When considering the reasonableness of the officer's methods under the circumstances, courts consider whether the officer had "sufficient basis to fear for his [or her] safety to warrant the intrusiveness of the action taken." *United States v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2014). This "'inquiry is undertaken ... from the perspective of law enforcement,' while bearing in

PAGE 12 – OPINION AND ORDER

mind that 'the purpose of a *Terry* stop is to allow the officer to pursue his investigation without fear of violence.'" *Id.* (quoting *United States* v. *Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009)). "[B]ecause this inquiry is fact specific, it is often left to the determination of a jury." *Green*, 751 F.3d at 1047.

Here, when he arrived at the scene, Defendant targeted Plaintiff with a high-powered rifle, held him at gunpoint, told him first to kneel and then to walk backwards to the officers. Plaintiff was then handcuffed, searched, and placed in the back of the police car. *See Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1047 (9th Cir. 2014) (finding that holding a suspect at gunpoint and employing handcuffs during an investigatory stop was "highly intrusive").

Generally, drawing weapons and using handcuffs are not permitted during a *Terry* stop. *McArthur*, 190 F. Supp. 3d. at 902. But, in certain circumstances, it is permitted, including:

> (1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; (2) where the police have information that the suspect is currently armed; (3) where the stop closely follows a violent crime; and (4) where the police have information that a crime that may involve violence is about to occur.

*Reynaga Hernandez*, 969 F.3d at 940–941 (quoting *Washington*, 98 F.3d at 1189). "These factors should all be considered in light of the specificity of the information law enforcement has to suggest both that the individuals are the proper suspects and that they are likely to resist arrest or police interrogation." *Green*, 751 F.3d at 1047 (citing *Washington,* 98 F.3d at 1189–90). The number of police officers present is also highly relevant. *Id.* While these considerations are not exhaustive, they all inform the ultimate inquiry of whether the officers' conduct was a "*reasonable* response to legitimate safety concerns on the part of the investigating officers." *Id.* (citing *Washington*, 98 F.3d at 1186).

PAGE 13 – OPINION AND ORDER

Here, the initial stop—including the use of the firearm—was permissible given the nature of the information relayed to police. So was the initial decision to detain Plaintiff in handcuffs while Defendant attempted to determine if Plaintiff was armed. But in reviewing the facts in the light most favorable to Plaintiff, a rational jury could find that the tactics used by Defendant— specifically the continued use of handcuffs in the back of the police car after it was determined no weapon was present—went beyond the level of intrusiveness justified by the circumstances. *See McArthur,* 190 F. Supp. 3d at 903 (holding that "up until the moment when all of the men had been searched for weapons, the officers reasonably believed that the tactics used were necessary to protect the officers" own safety and the safety of the public); *see also Bennett v. City of Eastpointe*, 410 F.3d 810, 840 n.7 (6th Cir. 2005) (noting that "in the cases where courts have found detention in the back of a police car to be reasonable under the circumstances, the individuals were not also handcuffed").

Plaintiff was immediately cooperative, a fact which Defendant relayed to his supervisor. BODYCAM 2 17:45. Plaintiff also had a visible dialysis port on his forearm and explained that he had completed dialysis treatment earlier that same day. BODYCAM 2 17:43. A search early on dispelled the notion that Plaintiff had a weapon on his person, in his vehicle, or anywhere in the immediate vicinity. [6] And Gayles' reports of an imminent violent threat were discredited both by Plaintiff and by Straub. Moreover, although there is no confirmed number of officers who responded to the incident, bodycam footage shows close to a dozen officers at the scene and there is no evidence any officer felt threatened by Plaintiff. *Cf. Garza v. City of Salem*, 690 F.

---

[6] Indeed, the only party who was on the record as having been "known to have weapons," according to Defendant, was Gayles, and he was permitted to leave the scene unhindered, despite the likelihood that he had made the call to police under false pretenses. Miller Depo. 54:11-12. BODYCAM 1 17:02.

PAGE 14 – OPINION AND ORDER

Supp. 3d 1188, 1201 (D. Or. 2023) (finding that handcuffing did not convert stop to arrest because officer was only officer on scene, plaintiff was uncooperative, and suspect was detained no longer than necessary to confirm identity). Despite this, Plaintiff remained handcuffed in the police vehicle during the entire investigation. *See McArthur*, 190 F. Supp. 3d. at 902-03 (holding that detention with handcuffs was lawful through the completion of the pat-down search).

Defendant cites the probable cause for a potential menacing charge as a separate basis for handcuffing. But, as discussed, immediately after speaking to the bystander, Defendant acknowledged to his supervisor that he had no basis for a menacing charge. Given that the bystander offered no additional facts related to the investigation, a reasonable jury could conclude that Defendant had determined there was no probable cause prior to engaging with the bystander. And that could render the continued handcuffed detention disproportionately intrusive. *See Meredith v. Erath,* 342 F.3d 1057, 1062 (9th Cir.2003) (holding that using handcuffs during an investigatory detention must be justified and noting that handcuffing significantly aggravates the intrusiveness of the encounter).

3.      *Defendant's Familiarity with Complainant's Reputation*

Plaintiff argues that a reasonable jury could also find that Defendant should have quickly realized Gayles' claims were unsubstantiated, given his familiarity with Gayles' character. The Court agrees that Defendant's familiarity with Gayles is another factor that a jury could consider when weighing the reasonableness of Defendant's actions. Defendant testified that the first case he worked with Coburg PD involved Gayles. Miller Depo. 30:01-30:04. He testified that he knew Gayles was involved with drugs and that he owed suppliers money. Miller Depo. 30:13-30:16. At the outset of the investigation, Defendant relayed to another officer that Gayles is a "meth head" and has mental health problems. BODYCAM 1 17:17. Notwithstanding Gayles' other

PAGE 15 – OPINION AND ORDER

characteristics, Defendant also testified that he considered Gayles to be a reliable witness. Miller Depo. 30:18-31:13. And of course, the possibility of a drug-related crime could have led Defendant to have concerns about weapons. But those are facts that a jury is best suited to consider.

In sum, the Court finds that there are sufficient questions of material fact that preclude summary judgment on Plaintiff's first claim. Defendant argues that there was "undisputed probable cause to believe a significant, violent offense involving a firearm had occurred." Def.'s Reply in Support of Mot. 2, ECF No. 19. But whether Defendant had or continued to have probable cause throughout the detention is disputed; that very question is at the heart of Plaintiff's suit. And Defendant's own testimony belies the certainty of probable cause; Defendant cannot articulate any clear reason that would explain ongoing reasonable suspicion or probable cause necessitating Plaintiff's detention particularly prior to pausing to talk with the bystander. Defendant's motion for summary judgment on Plaintiff's first claim is therefore denied.

## II.    Equal Protection Claim

Defendant argues that he is entitled to summary judgment on Plaintiff's Equal Protection claim because Plaintiff cannot show that he acted with discriminatory intent. Def.'s Mot. 8.

The proper "constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause" of the Fourteenth Amendment. *Whren v. U.S.*, 517 U.S. 806, 813 (1996). To that end, the Equal Protection Clause "provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures." *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997). To prevail at summary judgment on an Equal Protection claim, "a plaintiff must 'produce evidence sufficient to permit a

PAGE 16 – OPINION AND ORDER

reasonable trier of fact to find by a preponderance of the evidence that [the] decision . . . was racially motivated.'" *Sims v. Brown*, No. 23-35545, 2024 WL 1854284, at *6 (9th Cir. Apr. 29, 2024) (quoting *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 948-49 (9th Cir. 2003), *overruled on other grounds by Edgerly v. City & Cnty. of San Francisco*, 599 F.3d 946, 956 n.14 (9th Cir. 2010)). "Evidence that the plaintiff and the defendant are of a different race, combined with a disagreement as to the reasonableness of the defendant's conduct toward the plaintiff, is insufficient to show a violation of the Equal Protection Clause." *Taylor v. VanGesen*, No. C18-5682 BHS, 2021 WL 1140269, at *2 (W.D. Wash. Mar. 25, 2021).

Plaintiff's evidence of racial discrimination relies on several factors. First, Plaintiff points to statistical evidence showing that in "2022-2023, 3% of Coburg police stops were of Black people—compared to Coburg's Black population of zero." Compl. ¶ 12. And, during that same reporting period, "nearly 19% of Coburg police encounters" involved racial minorities, "compared to Coburg's 2.3% minority population." Compl. ¶ 13. Plaintiff argues that these statistics, when considered in connection with Defendant's disparate treatment of Plaintiff and Gayles, a "white unreliable complainant," could lead a reasonable jury to conclude that the conduct was discriminatory in nature. Pl.'s Resp. to Def.'s Mot. 8, 16.

Plaintiff relies on *Marshall v. Columbia Lea Regional Hosp.*, 345 F.3d 1157 (10th Cir. 2003), to support his position that "where direct evidence of racial profiling does not exist, the plaintiff may survive summary judgment by relying on such evidence as statistics; the officer's behavior during the events in question; and . . . the record of the officer's other racially selective stops and arrests." Pl.'s Resp. to Def.'s Mot. 16. In *Marshall*, the plaintiff "presented evidence regarding extensive alleged misconduct" by the arresting officer at his previous law enforcement role. *Id*. at 1170. The plaintiff in that case further provided evidence of records that "would

PAGE 17 – OPINION AND ORDER

establish a pattern of discrimination against blacks and Hispanics, and a *modus operandi* similar to that in [this] case." *Id*. at 1170-71.

Here, Plaintiff provided only general demographic statistics, nothing specific to Defendant's traffic stops and arrests. *See Marshall*, 345 F.3d at 1168. If, as was the case in *Marshall*, Defendant's stop and arrest statistics were markedly skewed in a manner indicating disparate enforcement along racial lines, this might be sufficient to survive at the summary judgment stage. By way of comparison, the statistics in Plaintiff's Complaint provide only demographic information pertaining to the population of the City of Coburg and vague statistics regarding the Coburg Police Department's "police encounters." Compl. ¶¶ 10-13. And, unlike in *Marshall*, there is no evidence that Defendant's continued detention of Plaintiff after Gayles was released was based on intentional racial discrimination.

Defendant, correctly or not, apparently believed that Gayles was the "victim" and not subject to continued detention. It was not until Plaintiff suggested possible charges against Gayles for filing a false report that Defendant moved Gayles from the victim column of the balance sheet to the (possible) perpetrator column. Miller Depo. 46:12-46:19. Even viewed in the light most favorable to Plaintiff, Defendant's actions, at most, show a degree of implicit bias. But an Equal Protection claim requires evidence sufficient to infer intent, rather than loose implications. There is no evidence here that could support such a claim. Summary judgment is therefore granted as to Plaintiff's Equal Protection claim.

### III.    Qualified Immunity

Defendant's final argument is that qualified immunity bars Plaintiff's claims. Defendant states that the measures he took during the investigation are "permissible during *Terry* stops

PAGE 18 – OPINION AND ORDER

when officer safety is at stake." Def.'s Mot. 9. Here, taken in the light most favorable to Plaintiff, the facts do not support qualified immunity.

An officer is entitled to qualified immunity so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)); *see also Butler v. Elle*, 281 F.3d 1014, 1021 (9th Cir. 2002). "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) (quoting *Saucier v. Katz*, 533 U.S. 194, 200 (2001)). As such, courts must resolve "immunity questions at the earliest possible stage in [the] litigation." *Torres*, 648 F.3d at 1123 (quoting *Pearson*, 555 U.S. at 232).

To determine whether qualified immunity applies, a court must examine: "(1) whether a public official has violated a plaintiff's constitutionally protected right; and (2) whether the particular right that the official has violated was clearly established at the time of the violation." *Id.* (citing *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 788 (9th Cir. 2016) (en banc)). These prongs can be addressed in either order. *Fuhr v. City of Seattle*, No. 24-5618, 2026 WL 1252331, at *3 (9th Cir. May 7, 2026).

The first prong of the analysis turns on whether there was a violation of Plaintiff's constitutional rights. This requires an analysis of the facts. *Fuhr*, 2026 WL 1252331, at *3. And when analyzing this question, the facts are taken in the light most favorable to Plaintiff. *See Thomas v. Dillard*, 818 F.3d 864, 875 (9th Cir. 2016) (emphasizing that for purposes of evaluating qualified immunity for a *Terry* stop the facts are viewed in the light most favorable to Plaintiff). As discussed above, taken in the light most favorable to Plaintiff, a jury could

PAGE 19 – OPINION AND ORDER

conclude that the stop exceeded the permissible bounds of a *Terry* stop in violation of the Fourth Amendment.

The next step is determining whether the right was clearly established at the time of the stop. *Fuhr*, 2026 WL 1252331, at \*3. "To determine whether [an officer] violated clearly established law, we look to cases relevant to the situation [the officer] confronted, mindful that there need not be a case directly on point." *A.K.H. by and through Landeros v. City of Tustin*, 837 F.3d 1005, 1013 (9th Cir. 2016) (internal quotation marks and citation omitted). And while a representative case need not be directly on point, this Court must look for precedent sufficiently analogous to the facts here, where "an officer acting under similar circumstances was held to have violated the Constitution." *Fuhr*, 2026 WL 1252331, at \*3 (quoting *Zorn v. Linton*, 607 U.S. ---, 146 S. Ct. 926, 930 (2026)) (cleaned up). The Ninth Circuit has cautioned that a "clearly established right 'should not be defined at a high level of generality'" but instead must be "particularized to the facts of the case." *Id.* (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)) (per curiam) (cleaned up).

The question, then, is whether Plaintiff's right to be free from a prolonged, handcuffed detention was "clearly established" given the "context of the case." *Thomas*, 818 F.3d at 886 (citations omitted). The broad protection provided by qualified immunity allows for officers to make "reasonable but mistaken judgments." *Id.* at 887 (citation omitted). Consequently, only those officers who are "plainly incompetent" or those who "knowingly violate the law" are exempted from this doctrine. *Id.* For these reasons, the "statutory or constitutional question" at issue must be "beyond debate." *Id.*

It was well-established at the time of Plaintiff's detention that exceeding the scope of a lawful *Terry* stop violated a suspect's Fourth Amendment rights. *See Liberal v. Estrada*, 632

PAGE 20 – OPINION AND ORDER

F.3d 1064, 1080 (9th Cir. 2011), *abrogated on other grounds by Hampton v. California*, 83 F.4th 754 (9th Cir. 2023) (holding that as of 2005 "the law was clearly established that a prolonged seizure without a valid investigatory purpose was unreasonable in violation of the Fourth Amendment"). And it has also long been established that "handcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop." *Washington*, 98 F.3d at 1189 (citing *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982)). Finally, there is no question that there was a clearly established right to be free from unreasonable seizures including an arrest without probable cause. *Dunaway v. New York*, 442 U.S. 200, 207-10 (1979). Applying these general principles to the facts of this case, the Court looks to precedent that involves the continued handcuffing and detention of an unarmed, cooperative suspect without probable cause while the lead officer engages in non-emergent community caretaking unrelated to the stop. *Cf. Fuhr*, 2026 WL 1252331, at *3 (defining the specific inquiry in that case as "precedent that encompasses a noncompliant, fleeing, potentially armed suspect holding a child or potential hostage").

Plaintiff offers two representative cases in support of his position that the right was clearly established. First, in *Nicholson v. City of Los Angeles*, 935 F.3d 685 (9th Cir. 2019), officers were denied qualified immunity where teenage Plaintiffs were detained in handcuffs for five hours, long after any probable cause had dissipated. *Id*. at 691. *Nicholson*, although not entirely on point, is similar to this case in that those officers believed the Plaintiffs were involved in an armed robbery, and after they discovered no evidence of criminal activity, they continued to hold the Plaintiffs in handcuffs.

Second, Plaintiff points to *Meredith v. Erath*, 342 F.3d 1057 (9th Cir. 2003), where an Agent detained a person in handcuffs while investigating nonviolent tax-related crimes. While

PAGE 21 – OPINION AND ORDER

the facts in *Meredith* are markedly different than the facts here, in *Meredith* the Ninth Circuit clearly established that "handcuffing a person and detaining her in handcuffs during a search for evidence . . . absent justifiable circumstances, will result in a Fourth Amendment violation." *Meredith*, 342 F.3d at 1063.

Against that backdrop, the question is whether an objectively reasonable officer in Defendant's position would know his conduct was unlawful. The Court is cognizant that in making this determination, it is important not to second guess officers at the scene. *Liberal*, 632 F.3d at 1081. While Plaintiff generally argues the length of the detention and the use of handcuffs violations the Fourth Amendment, he points specifically to the conversation with a bystander as conclusive evidence of a prolonged detention. Defendant cites officer safety, probable cause, and the need for community caretaking to defend his decisions.

Looking at the facts in the light most favorable to Plaintiff, a jury could reasonably conclude that Defendant left Plaintiff in handcuffs despite having already concluded there was no probable cause for his arrest and that he was not in possession of any weapons. He engaged in an unrelated conversation with a bystander before releasing him. An objectively reasonable officer would know that engaging in unrelated activities while a suspect was handcuffed in a patrol car without probable cause violated the Fourth Amendment. And where the "objective reasonableness of an officer's conduct turns on disputed issues of material fact, it is 'a question of fact best resolved by a jury.'" *Torres*, 648 F.3d at 1123 (quoting *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003)). It is "only in the absence of material disputes" that the applicability of qualified immunity becomes "a pure question of law." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)).

PAGE 22 – OPINION AND ORDER

## CONCLUSION

For the reasons stated in the above Opinion, Defendant's Motion for Summary Judgment, ECF No. 14, is DENIED as to Plaintiff's first claim and GRANTED as to Plaintiff's second claim.

DATED this 1st  day of June, 2026.

       /s/Amy E. Potter
AMY E. POTTER
United States Magistrate Judge